NETHERCLIFT and others *v.* ROBERTSON.

(*Circuit Court, S. D. New York.* June 19, 1886.)

1. CUSTOMS DUTIES—TREATIES—TARIFF LAWS—DOMINICAN REPUBLIC—HAWAIIAN ISLANDS.

The treaty with the king of the Hawaiian Islands, and the act of congress giving it effect, (19 St. at Large, 200,) by which sugar from those islands was admitted into the United States free of duty, did not operate upon the previous treaty with the Dominican republic, so as to establish a like exemption as to sugar imported from the latter country; following *Bartram* v. *Robertson,* 15 Fed. Rep. 212, and *Whitney* v. *Robertson,* 21 Fed. Rep. 566.

2. SAME—ACT OF CONGRESS OF 1883.

The eleventh section of the tariff act of 1883, referring to the sanctity of treaty obligations, notwithstanding that act, was not intended to revive and set in motion the inert features of the Dominican treaty.

At Law.

In October, 1884, the plaintiffs imported from Puerta Plata, in the Dominican republic, two cargoes of sugar and molasses. The col-

lector assessed duties thereon pursuant to the provisions of Schedule E of the tariff act of 1883. 22 St. at Large, 488, 502. The plaintiffs protested, insisting that their importations should have been admitted free, under the stipulations of the treaty between the United States and the Dominican republic, concluded February 8, 1867. The ninth article of that treaty is as follows:

"No higher or other duty shall be imposed on the importation into the United States of any article the growth, produce, or manufacture of the Dominican republic, or of her fisheries; and no higher or other duty shall be imposed on the importation into the Dominican republic of any article the growth, produce, or manufacture of the United States, or their fisheries, than are or shall be payable on the like articles the growth, produce, or manufacture of any other foreign country, or its fisheries." 15 St. at Large, 478.

Subsequently to the date of this treaty, congress, by various enactments, imposed duties on all sugar and molasses imported from foreign countries. On the thirtieth of January, 1875, a convention was concluded between the king of the Hawaiian Islands and the United States, by the first article of which it was stipulated that "for and in consideration of the rights and privileges granted by his majesty, the king of the Hawaiian Islands, in the next succeeding article of this convention, and as an equivalent therefor, the United States of America hereby agree to admit all the articles named in the following schedule, the same being the growth and manufacture or produce of the Hawaiian Islands, into all the ports of the United States free of duty." The schedule which followed contained, among other things, "muscovado, brown, and all other unrefined sugar, meaning hereby the grades of sugar heretofore commonly imported from the Hawaiian Islands, and now known in the markets of San Francisco and Portland as 'Sandwich Island sugar,' syrups of sugar-cane, melado, and molasses." It was provided by the fifth article that the convention should take effect as soon as approved and ratified, but not until a law to carry it into operation should be passed by the congress of the United States. The convention was ratified in 1875. 19 St. at Large, 625. On the fifteenth of August, 1876, congress passed the contemplated act, which provides, in substance, that whenever the president of the United States shall receive satisfactory evidence that the legislature of the Hawaiian Islands has passed laws to give full effect to the provisions of the convention, he is authorized to issue his proclamation declaring that he has such evidence, and from the date of such proclamation the articles mentioned in the schedule before named—sugar, molasses, etc.—shall be introduced into the United States free of duty. 19 St. at Large, 200. On the ninth of September, 1876, the president issued his proclamation, declaring that he had received the evidence required by the said act. 19 St. at Large, 666. In the tariff act of 1883—the act under which the plaintiff's importations were classified—congress declares that "there shall be levied, collected, and paid, on all articles imported from foreign countries, and men-

tioned in the schedules herein contained, the rates of duty which are, by the schedules, respectively prescribed." Schedule E provides for all sugars and molasses of designated grades.

The eleventh section of the act of 1883 is as follows:

"Nothing in this act shall in any way change or impair the force or effect of any treaty between the United States and any other government, or any laws passed in pursuance of or for the execution of any such treaty, so long as such treaty shall remain in force in respect of the subjects embraced in this act; but whenever any such treaty, so far as the same respects said subjects, shall expire or be otherwise terminated, the provisions of this act shall be in force in all respects in the same manner and to the same extent as if no such treaty had existed at the time of the passage thereof." 22 St. at Large, 525.

The plaintiffs proved that the sugar and molasses imported by them would have been admitted free if they had come from the Hawaiian Islands. The defendant offered no evidence.

*Henry E. Tremain,* (*Charles Currie* was with him on the brief,) for plaintiffs.

*Stephen A. Walker,* U. S. Atty., and *Thomas Greenwood,* Asst. U. S. Atty., for defendant.

COXE, J. In *Bartram* v. *Robertson,* 21 Blatchf. 211, S. C. 15 Fed. Rep. 212, this court decided that congress has power to annul a treaty, so far as it operates as a rule of municipal law; that the provisions of the Danish treaty, (8 St. at Large, 340,) which are similar to those now in question, and which, it was argued, admitted the productions of Denmark on the same terms as those of the Hawaiian Islands, could not be enforced, because, subsequent to the treaty, congress had imposed duties upon all sugar and molasses of designated grades. The general law included Denmark, and her products could not, therefore, be admitted free without an express legislative enactment. The court held, also, that even though the provisions of the Danish treaty were incorporated in the tariff law, it would not change the result; the fair meaning of the stipulation being that there should be no unfriendly discrimination against Denmark, and there is none when she is placed on an equal footing with all foreign nations, with one exception only. It was further held that, as the same stipulation, substantially, is found in upwards of 40 treaties, a construction which would exempt the products of these countries whenever similar products of a single country are exempted, is too startling to be entertained. The court should hesitate long before dealing such a staggering blow to our revenue. This decision was afterwards followed in *Whitney* v. *Robertson,* 21 Fed. Rep. 566, the Dominican treaty being under consideration. The latter case is in all respects similar to the case in hand, except that it arose prior to the act of 1883.

There may, possibly, be some difficulty in sustaining the proposition that the legislation since 1867, and prior to 1883, abrogated, suspended, or in any way affected the ninth article of the treaty. The

tariff acts of 1870, 1874, (Rev. St.,) and 1875, though passed subsequently, cannot, it may be urged, be interpreted to suspend the ninth article, for the reason that there was nothing to give it vitality until the Hawaiian treaty was ratified. Then, for the first time, the stipulation providing for "no higher or other duty," etc., become operative. At the time the acts referred to were passed all sugar was dutiable, including "Sandwich Island sugar." The discrimination in favor of the Hawaiian Islands did not exist. The law-makers could not have had in mind the provisions of the Dominican treaty. All sugar was taxable, and therefore "all sugar" was included in the statute. The treaty and the tariff acts were not repugnant; both could stand at the same time. In other words, it cannot be said that congress, in 1870, intended to annul a provision which then had no operative existence, and could have none unless special privileges were, in the future, accorded to some other nation. If, for instance, in 1867, congress had passed a law providing that if at any time thereafter Hawaiian sugar should be admitted free, Dominican sugar, also, should be so admitted, there certainly is room to doubt whether such an act would be repealed or affected by the subsequent re-enactment of a general statute imposing a duty upon all sugar, Hawaiian and Dominican included. If, after or even at the time of the Hawaiian treaty, congress had imposed a duty upon Dominican sugar, or generally upon all sugar, excepting "Sandwich Island sugar," the argument that the law-making power intended to disregard the treaty obligations would then be well-nigh irresistible. But in the *Bartram* and *Whitney* cases there would seem, perhaps, to be some force in the proposition that the annulling or suspending legislation took place when there was nothing to suspend or annul, and when the provisions of the treaty could not have been present to the minds of the law-makers. Though the question, in this respect, may not be free from doubt, it is entirely clear that it is the duty of this court to follow the law as settled by these decisions. It is, indeed, freely conceded that they are controlling, and it is not easy to perceive why they do not dispose of the present controversy.

Leaving out of view, for the moment, all other considerations, by what process of reasoning can the court reach a conclusion favorable to the plaintiffs, and at the same time give force to the construction that the stipulations of the ninth article are satisfied when no unfriendly discrimination is made against the products and manufactures of the Dominican republic? Even though this article were incorporated *in hæc verba* in the act of 1883, so as to eliminate all questions as to its present validity and operative force, it would not avail the plaintiffs. If the rule of interpretation in *Bartram* v. *Robertson* is correct, the plaintiffs have no right to complain so long as they pay no higher duty than is imposed upon similar importations from other countries. The situation is not affected by the one exception in favor of the Hawaiian Islands. In other respects, too,

these decisions are precedents as controlling of a cause arising since the act of 1883 as prior thereto.

The only new element in the case at bar is found in the provisions of the eleventh section of that act. It is contended that by this legislation the dormant and moribund features of the treaty were revived, strengthened, and made operative. I cannot think that the court would be justified in giving to the broad and general language of the eleventh section a construction so radical and far-reaching. At the date of the act congress found the Hawaiian treaty in full operation,—a treaty affecting a group of lonely and isolated islands far out in the Pacific; a treaty by the terms of which the United States permitted certain articles to enter our ports free, upon the express consideration, however, that the Island ports should be open to a much larger number of articles, the growth or manufacture of this country. No other similar treaty was in operation. The courts had expressly decided that the convention with the Hawaiian Islands did not set in motion provisions similar to the one in question. If not annulled, they at least were suspended and disutilized. Dominican sugar had paid duties for 16 years. The aim of the law-makers was to preserve unchanged and unimpaired the existing state of things. It is hardly supposable that it was their purpose to make a sweeping change in the law; to open our ports, without advantage or consideration, to the products of many countries; to destroy a vast source of revenue; and to encourage fraud, by making the Dominican republic the dumping ground for the sugar and molasses of the West Indies. If this had been their design, they would have said so in language too plain and unequivocal to admit of doubt. It is thought, also, that there is force in the proposition that the provisions of the ninth article of the Dominican treaty amount simply to an agreement between the contracting parties not to discriminate against each other in the future by unfriendly legislation. The action of congress is necessary, and until such action is had the courts must follow the law as it is found on the statute books. *Taylor* v. *Morton*, 2 Curt. 454, 463.

The questions involved in this controversy are of such interest and importance that they will doubtless be presented for final settlement to the supreme court. Under existing law, however, it is not possible for the plaintiffs to recover. There must, therefore, be a verdict directed for the defendant.