Weldon, J.,
delivered the opinion of the court:
The facts show that the ship Rose, William Chase, master, sailed on a commercial voyage from Newburyport, Mass., on the 20th of March, 1799, bound for Surinam, and thence sailed on the 23d of July, 1799, bound home to Newburyport.
While pursuing the last voyage she was captured on the high seas on the 31st of July, 1799, by the French cruiser L’ Egypt Conquise, mounting 14 guns and 120 men; after an action of two and one-half hours, in which the master of the Rose lost 3 men killed and 14 wounded and the French lost 25 killed and 21 wounded, the Rose' was captured and taken, into Guadeloupe, where, on the 6th day of August, 1799, the vessel and cargo were condemned by the tribunal of com *298 merce, sitting' at Basse Terre, Guadeloupe, under a decree in which it is alleged that “the captain of said ship was the bearer of a commission from the President of the United States which authorized him to capture French armed vessels and carry them into any port of the United States, and that the captain of the vessel resisted until he was subdued by force of arms. In view of these facts the court makes reference to articles in justification of said proceedings.” The findings establish the fact that the American ship resisted most vigorously the attempted right of seai-ch upon the part of the French ship, and we are to determine from that condition as an incident of the seizure whether such seizure and condemnation were illegal.
The legal effect of resisting search on the part of the American ship, when it was sought to bo exercised on the part of the French ship, has not been determined by any adjudication of this court in the various cases tried under the act of Congress, giving this court jurisdiction to determine the claims of American citizens for alleg'ed spoliations committed by the French prior to the 1st day of July, 1801.
The nearest approach that the court has made to the subject of the right of search is in the case of the Nancy (27 C. Cls. R., p. 99). In that case the ship sailed from Baltimore in 1797; was captured by an English, ship and sent to St. Nicholas Mole, and there the master was ordered not to depart without a convoy.- She sailed under the escort of a privateer for Jerome and returned to the Mole under escort. On the return voyage the Nancy was captured by a French privateer. It is said in that case that “the question whether a neutral vessel laden with neutral caigo is liable to condemnation if captured under enemy convoy has never been directly determined; but on a review of the cases and elementary writers it is now held that if captured when actually and voluntarily under the protection of an enemy she is liable.” Sailing under the convoy of an enemy is the exercise of the same power which is brought into requisition on the part of a neutral vessel when it resists the right of search by actual force.
If sailing under á convoy of an enemy of the belligerent is a just ground for seizure and condemnation, it must follow *299 that resisting the exercise of search, as it was in this case, involves as serious consequences to the neutral vessel as-where the right was denied by the presence and use of a convoy.
It is not necessaiy to multiply authorities to establish the right of jsearclL It is said by Chancellor Kent (1 Kent’s ‘-Commentaries, p. 155) that “in order to enforce the rights-of belligerent nations against the delinquencies of neutrals, and to ascertain the real as well as the assumed character of all vessels on the high seas, the law of nations arms them with the practical power of visitation and search. The duty of self-preservation gives to belligerent nations this right. It is founded upon necessity, and is strictly and exclusively a-war right, and does not rightfully exist in time of peace, unless conceded bjr treaty. All writers upon the law of nations, and the highest authorities, acknowledge the right in time of war as resting on sound principles of public jurisprudence and upon the institutes and practice of all great maritime powers.” It is. said by the same authority, page 154: “The whole doctrine was ably discussed in the English high court of admiralty in the case of the Maria, and it was adjudged that the right was incontestable, and that a neutral sovereign could not, bjr the interposition of force, vary that right.”
In that case it is said by Sir William Scott, in stating the principles of international law upon the subject of search and of the right of a belligerent to search neutral vessels engaged in commerce on the high seas, “that the right of visiting and searching merchant ships upon the high seas, whatever be the' ships, whatever be the cargo, whatever be the destination, is-an incontestable right of lawfully commissioned cruisers of a belligerent nation. I say, be the ships, the cargoes, and destinations what they may, because till they are visited and searched it does not appear what the ships, the cargo, or the-destinations are, and it is for the purpose of ascertaining these points that the necessity of this right of search exists.”
Chancellor Kent, page 155, in further elaboration of the doctrine of the right of search, states the circumstances which might constitute an exception to that general rule, which makes it the duty of the neutral to subject itself to the juris *300 ■diction of the belligerent in the exercise of the right of search. He says:
“There may be cases in which the master of a neutral shiji may be authorized by the natural right of self-preservation to defend himself against extreme violence threatened by a cruiser grossly abusing his commission; but except in extreme cases a merchant vessel has no right to say for itself, and an armed vessel has no right to say for it, that it will not submit to visitation and search or be carried into an proximate port for judicial inquiry.”
The circumstances of this capture do not indicate that the condition cited by Chancellor Kent (which may be regarded as an exception to the general rule) existed in this case. While there might have been in the minds of the crew of the neutral vessel grave apprehensions of ultimate condemnation, ■even with reference to the legitimate defenses, that condition of apprehension upon the part of the resisting neutral did not justify him in denying the right of search to the belligerent. The circumstances of this case disclose a most vigorous assault and defense, there being twentjr-four men killed •and thirty-six wounded during the encounter between the respective, vessels. This was actual resistance, and was only ■overcome by the most determined effort upon the part of the ■capturing vessel.
The right of search is so sacred in the view of international law that it is protected by enforcing the consequences of resistance where no actual resistance is made. As in the case of a convoy, it has been held by this court in the case of the Nancy (27 C. Cls. R., 99) that the presence of a convoy is constructive resistance and a denial of the right of search, which authorizes seizure and consequent condemnation.
It is most strenuously and ably argued by counsel that at the date of capture there was in existence the statute of June 25, 1798, entitled “An act to authorize the defense of merchant vessels of the United States against French depredations” (1 Stat. L., 572), and that-bj7 virtue of the provisions of that act the commander and crew of a vessel had a right to resist by all means in their power an attempt upon the part of a French commander and crew to search the American ves.sel. It is provided in that statute—
“That the commander and crew of any merchant vessel of .the United States, owned wholly b}7 a citizen or citizens *301 thereof, may oppose and defend against any search, restraint,, or seizure which sháll be attempted upon such vessel or upon any other vessel owned, as aforesaid, by the commander or crew of any armed vessel sailing under French colors, or acting or pretending to act by or under the authority of the French Republic; and may repel by force any assault or hostility which shall be made or committed on the part of such French or pretended French vessel pursuing such attempt, and may subdue and capture the same, and may also retake any vessel owned as aforsaid which may have been captured by any vessel sailing under French colors, or acting or pretending to act, by or under authority from the French Republic.”
Whatever may be said as to the condition or status of the legal rights and obligations of the French and American Governments before the act July 9, 1798 (1 Stat. L., 578), it must! be assumed that after that period the principles and rules of' international law determined and controlled the parties with reference to their rights on the high seas.
It is said, in the case of the Nancy (supra), “it has been-urged that the statute of the United States authorizes resistance by our merchantmen to French visitation and search, to-which there is the simple answer that no single State can change the law of nations by its municipal regulations.”
The contention of claimants’ counsel with reference to the rights guaranteed to Americad merchantmen under .and by virtue of the provisions of the act of 1798 is fully answered by the decision of this court in the above case. If, therefore, at the time of this seizure there was any conflict between the municipal law of the United States, as exemplified in the statute, and the well-recognized principles of international law, the latter must prevail in the determination of the rights of the parties.
By the provisions of the act giving this' court jurisdiction to ascertain the claims of American citizens for spoliations committed by the French prior to the 31st of July, 1801, it is, in substance, provided that the validity of said claims shall be determined according to the rules of law, municipal and international, and the treaties of the United States applicable to the same. In order to perform the duties consistent with the requirements of the statute, the court must give each department of the law full recognition and force when properly *302 applicable to the facts and circumstances of the controversy involved in the litigation.
The rights of the claimant are to be measured by the unlawful acts of France, and unless a wrong exists under the rules of international law, no liability can attach to the United States; because, by the treaty of 1800, it was only the claims growing out of the wrongful act of France for which the United States had a diplomatic claim and which were assumed to be paid to the citizen whose individual right was violated in that wrong.
This court in making the investigation contemplated by the act of our jurisdiction is sitting in the character of an international tribunal, to determine the diplomatic rights of the United States as they existed against France prior to the ratification of the treaty of September 80, 1800.
The municipal law in the absence of a treaty must be subordinated to international law when they come in antagonism, as that is the law common to both parties.
Where the question is not exclusively within the domain of international law then the municipal law may be invoked to •determine the proper solution of the question. The rules of property by which the citizen owned the subject-matter of the seizure and condemnation may be properly applied in ascertainment of his rights, and so may many questions of the law of evidence be decided in accordance with the municipal law of the party whose rights have been violated. Congress, in the enactment of the law of our j urisdiction, must be presumed as having recognized many of the principles of municipal law incident to our forms of judicial procedure and •determination.
It has been argued that the belligerent, in making the attack on the vessel of the claimant, was not in the exercise of the legal right of search as incident to him as a belligerent, but that it was an assault, the object and purpose of which was the seizure and condemnation without reference to the fact or condition of being a neutral vessel of the United States engaged in the peaceful and lawful commerce of the sea; that the condition existing between the two Governments and peoples was such that all respect of neutral rights had ceased, and that force, fraud, and violence prevailed, and in that connection much is said as to the right of self-defense.
*303 The claimants are treading on very dangerous ground when they urge the higher law of self-preservation. Self-defense is founded on the theory that it is the-only remedy, and that, being the only remedy, it presupposes the absence of all law protecting the rights of him who asserts the prerogative of self-defense. If the right of self-defense prevailed to the extent of repelling force by force, and was incident to the crew of the ship captured, then all other law was silent and war prevailed, which condition would be most disastrous to the case of the claimants.
As we have quoted in another case, decided at the present term of court, from the opinion delivered by Sir William Scott in the case of the Maria, in 1 C. Rob., 340, so we quote upon the subject, of the light of self-defense in this case:
“How stands it by the general law? I do not say that cases may not occur in which a ship may be authorized by the natural rights of self-preservation to defend itself against extreme violence threatened by a cruiser grossly abusing his commission; but where the utmost injury threatened is the being carried in for inquiry into the nearest port, subject to a full responsibility in costs and damages, if this is done vexatiously and without just cause, a merchant vessel has not a right to say for itself (and an armed vessel has not a right to say for it), ‘I will submit to no such inquiry, but I will take the law into my own hands by force.’ What is to be the issue, if each neutral vessel has a right to judge for itself in the first instance whether it is rightly detained, and to act upon that judgement to the extent of using force? Surely nothing but battle and bloodshed, as often as there is anything like an equality of force or an equality of spirit.”
For the reasons above stated the court decides, as a conclusion of law, that the seizure and condemnation were lawful and that the owners and insurers had no valid claim of indemnity therefor upon the French Government prior to the ratification of the convention between the United States and the French Republic, concluded on the 30th day of September, 1800, and that the claims were not relinquished to France by the Government of the. United States by said treaty in part consideration of the relinquishment of certain national claims of France against the United States, and that the claimants are not entitled to recover from the United States.
The facts in detail, with a copy of this opinion, will be certified to Congress in accordance with the statute.