Davis, J.,
delivered tbe opinion of tbe court:
Tbe Nancy, sailing from Baltimore to Port á Paix in tbe year 1797, was in June captured by an English vessel of war, taken into St. Nicholas Móle and there detained. She sailed thence (under constraint) for Jéremie, and there took in a cargo of coffee. Thereafter the schooner left Jéremie, under convoy bound back to St. Nicholas Móle, with intention there to join a convoy for the United States, but before arrival at the Móle and while under convoy she was captured by the French, August 2d; in due course she was condemned as prize, and, with her cargo, was lost to the owners.
The substantial ground of condemnation is found in the fact that when the Nancy was captured she was actually under convoy. The nature or nationality of the convoy is not shown, but the history of the time forces the presumption that it was an English armed vessel, either public, or, what is more likely, private. Jéremie was in possession of the English, so was the Móle. The Nancy was forced to take an English privateer as convoy from the Móle to Jéremie, and in the latter port it is more than improbable that she would have found any.armed vessel to escort her back to the Móle, which did not fly the flag of Great Britain. The record being silent upon this point, we are forced to assume that when captured she was under English protection.
One question of law alone, then, is presented for our decision: Was the condemnation legal of a neutral vessel laden with neutral cargo captured when under enemy convoy? There is, so far as we have been able to discover, no judicial decision in the United States upon the question presented by this record and which we now must consider and determine.
A case much cited in discussions of the right of search is the Nereid (9 Cranch, 389), but there the court decide only that neutral property is not tainted when laden upon an armed belligerent; and the principle governing such a case is thus stated by Chief Justice Marshall (p. 432): '
“The general rule, the incontestable principle, is that a neutral has a right to employ a belligerent carrier. He exposes himself thereby to capture and detention, but not to condemnation.”
*102 In the later case of the Atalanta (3 Wheat., p. 409) Mr. Justice Johnson, speaking of the distinction observed between neutral goods laden upon belligerent vessels and neutral vessels under convoy, made the following suggestions:
“A convoy is an association for a hostile object. In undertaking it, anation spreads overthe merchant vessel animmunity from search which belongs only to a national ship; and by joining a convoy every individual ship puts off her pacific character and undertakes for the discharge of duties which belong only to the military marine and adds to the numerical, if not the real, strength of the convoy. If, then, the association be voluntary, the neutral, in suffering the fate of the whole, has only to regret his own folly in wedding his fortune to theirs; or, if involved in the aggression or opposition of the convoying vessel, he shares the fate which the leader of his own choice either was or would have been made liable to in case of capture.”
And further (p. 424):
“ Resistance, either real or constructive, by a neutral carrier is, with a view to the law of nations, unlawful.”
The Atalanta, like the Nereid, was an armed British vessel, carrying neutral cargo. No question as to the effect of belligerent convoy was involved in either case, and Mr. Justice Johnson’s remarks can only be regarded as illustrative. They, howeVer, gain great force from the fact that in the case of the Nereid Mr. Justice Story (who dissented) wrote an opinion upon neutral duties which has always attracted general attention, and which is to-day found fully cited in the text-books, both those by our own authors and those written by citizens or subjects of other nations; in fact, one accepted authority has fallen into the error of ascribing Mr. Justice Story’s views to the court of which he was a member.
Mr. Justice Story said:
“It has, however, been supposed by the counsel of the claimants that a distinction exists between taking the protection of a neutral and of a belligerent convoy that in the former case all armament for resistance is unlawful, but in the latter case it is not only lawful, but in the highest degree commendable. That although an unlawful act, as resistance by a neutral convoy, may justly affect the whole associated ships, yet it is otherwise of a lawful act, as resistance of a belligerent ship; for no forfeiture can reasonably grow out of such an act, which is strictly justifiable.
*103 “ The fallacy of the argument consists in assuming the very ground in controversy and in confounding things in their own nature entirely distinct. An act perfectly lawful in a belligerent may be flagrantly wrongful in a neutral. A belligerent may lawfully resist search; a neutral is bound to submit to it. A belligerent may carry on his commerce by force; a neutral can not. A belligerent may capture the property of his enemy on the ocean; a neutral has no authority whatever to make captures. The same act, therefore, that with reference to the rights' and duties of the one may be tortious, may, with reference to the rights and duties of the other, be perfectly justifiable. The act, then, as to its character, is to be judged of not merely by that of the parties through whose immediate instrumentality it is done, but also by the character of those who, having cooperated in, assented to, or sought protection from it, would yet withdraw themselves from the penalties of the act. It is analogous to the case at common law where an act, justifiable in one party, does not, from that fact alone, shelter his coadjutor. They must stand or fall upon their own merits. It would be strange indeed if, because a belligerent may kill his enemy, a neutral may aid in the act; or because a belligerent may resist search, a neutral may cooperate to make it effectual. It is therefore an assumption utterly inadmissible that á neutral can avail himself of the lawful act of an enemy to protect himself in an evasion of a clear belligerent right.
“And what reason can there be for the distinction contended for? Why is the resistance of the convoy deemed the resist-tance of the whole neutral associated ships, let them belong to whom they may? It is not that there is a direct and immediate cooperation in the resistance, because the (¡ase supposes the contrary. It is not that the resistance of the convoy of the sovereign is deemed an act to which all his own subjects consent, because the ships of foreign subjects would then be exempted. It is because there is a constructive resistance resulting in law from the common association and voluntary protection against search under a full knowledge of the intentions of the convoy. Then the principle applies as well to a belligerent as to a neutral convoy; for it is manifest that the belligerent will at all events resist search; and it is quite as manifest that the neutral seeks belligerent protection with an intent to evade it. Is it that an evasion of search, by the employment, protection, or terror of force, is consistent with neutral duties t Then, a fortiori, the principle applies to a case of belligerent convoy, for the resistance must be presumed to be more obstinate and the search more perilous.
“ There can be but little doubt that it is upon the latter principle that the penalty of confiscation is applied to n eutr als. The law proceeds yet further, and deems the sailing under *104 convoy as an aether se inconsistent with neutrality, as a premeditated attempt to oppose, if practicable, tlie right of search, and therefore attributes to such preliminary act the full effect of actual resistance. In this respect it applies a rule analogous to that in cases of blockade, where the act of sailing with an intent to break a blockade is deemed a sufficient breach to authorize confiscation. And Sir William Scott manifestly recognizes the correctness of this doctrine in the Maria, although the circumstances of that case did not require its rigorous application.
“Indeed, in relation to a neutral convoy, the evidence of an intent to resist, as well as of constructive resistance, is far more equivocal than in case of a belligerent convoy. In the latter case it is necessarily known to the convoyed ships that the belligerent is bound to resist and will resist until overcome by superior force. It is impossible, therefore, to join such convoy without an intention to receive the protection of belligerent force in such manner and under such circumstances as the belligerent may choose to apply it. It is an adoption of his acts and an assistance of his interests during the assumed voyage. To render the convoy an effectual protection it is necessary to interchange signals and instructions, to communicate information, and to watch the approach of every enemy. The neutral solicitously aids and' cooperates in all these important transactions, and thus far manifestly sides with the belligerent and performs, as to him, a meritorious service — a service as little reconcilable with neutral duties as the agency of a spy or the fraud of the bearer of hostile dispatches. In respect to a neutral convoy the inference of constructive cooperation and. hostility is far less certain and direct. To condemn in such case is pushing the doctrine to a great extent, since it is acting upon the presumption, which is not permitted to be contradicted, that all the convoyed ships distinctly understood and adopted the objects of the convoy, and intimately blended their own interests with hostile resistance.” (Story, J., in the Nereid, 9 Cranch, 380.)
When Mr. Justice Johnson delivered the later opinion of the court in the case of the Atalanta, he had undoubtedly in mind the dissenting opinion delivered three years before by his colleague; his remarks as to convoy, therefore, were undoubtedly carefully weighed and considered, and should be given a force not usually accorded to illustrations or statements merely argumentative in a judicial decision. We infer that had the question of the effect upon a neutral of voluntary submission to belligerent convoy been before them for adjudication at that time, the Supreme Court would have followed the reasoning of Mr. Justice Story.
*105 Tbe discussions between tbe United States and Denmark early in tbis century are often alluded to in connection with questions similar to that presented in tbe case at bar, but it can not be effectively cited as bearing in any important manner upon tbe single issue now presented.
The treaty of 1830 with Denmark provided for tbe payment of tbe claims, but can not be regarded as a precedent, for it contained a declaration that tbe convention, having no other object than to terminate all tbe claims, “can never hereafter be invoked by one party or tbe other as a precedent or rule for tbe future.” (Dana’s Wheaton, part iv, section 537.)
Nor was tbe exact point we are now considering presented in tbe Danish case. Tbe question there discussed is thus stated by Mr. Wheaton, who conducted tbe negotiations and signed tbe treaty:
“The principle laid down in tbe ordinance as interpreted by tbe Danish tribunals was that tbe fact of having navigated under enemies convoy is, per se, a justifiable cause, not of capture merely, but of condemnation, in tbe courts of tbe other belligerent; and that, without inquiring into tbe proofs of proprietary interest or tbe circumstances and motives under which the captured vessel bad joined tbe convoy, or into tbe legality of tbe voyage, or tbe innocence of her conduct in other respects.” (Dana’s Wheaton, part iv, section 531.)
In Denmark tbe vessels were condemned because at a previous time they bad been under enemy convoy. When seized they were without convoy, whereas tbe Nancy was actually under convoy when captured.
If we omit consideration of points presented by a state of real or quasi armed neutrality, which do not affect our present purpose, we shall fail to find in tbe history of tbe Department of State any other precedent than the Danish case to be invoked in aid of a solution of tbe problem now presented to us.
Assuming, therefore, that the Supreme Court lias indicated through two learned justices that in their opinion voluntary submission by the neutral to tbe enemy convoy taints tbe vessel, we turn to tbe text writers.
Mr. Wheaton gives but little aid, as bis interesting discussion of convoy relates to the Danish negotiations and to tbe position then taken by him, not as an unprejudiced text writer, but as tbe diplomatic agent of tbe Government, acting under instructions from bis superior officers. His annotator, Mr. *106 Dana, is, however, most explicit when, be treats of the very question now before ns.
Speaking of neutral under belligerent convoy, Mr. Dana says:
“It is not enough for the ostensible neutral to say, or even to prove, that he is not justly liable to capture, for the law of nations requires him to afford the belligerent a certain mode of satisfying himself on that point by visit and search; and if he refuses, resists, or fraudulently evades the proper search, he is, for that cause, liable to capture. The only question ever raised has been, whether the fact of being found under belligerent convoy affords a conclusive presumption of an intent to deprive the other belligerent of the right of search, or is only a fact, having its weight, but open to explanation.” (Dana’s Wheaton, part iv, chapter hi, final footnote.)
Chancellor Kent also is direct in his statement:
“The very act of sailing under the protection óf a belligerent or neutral convoy, for the purpose of resisting search, is a violation of neutrality,” (1 Kent, p. 155.).
The principle upon which the Danish case was decided—
“Seems [accordingto Dr. Woolsey] to run between making-use of the enemy’s flag and putting one’s goods on board an armed enemy’s vessel. The former is done to enjoy certain privileges, offered by a party of war, which could not otherwise be secured. The latter may be done without complicity with the intentions or conduct of the captain of the armed ship, or may be done with the design of having two strings to one’s bow; of availing one’s self of force or not, as circumstances shall require. Upon the whole, the intention to screen the vessels behind the enemy’s guns is so obvious, that the act must be pronounced to be a decided departure from the line of neutrality, and one which may justly entail confiscation on the offending party.” (Sec. 193.)
Yattel (book iii, chapter 7, section 114), says:
“Anjourd’hui un vaisseau neutre, qui refuseroit de souff'rir la visite, se feroit condamner par cela seul, comme étant de bonne j)rise.”
Yalin, commenting upon the French ordinance of 1681, which provides that every vessel shall be good prize in case of resistance and combat, states that resistance alone without combat justifies condemnation. (Yalin sur l’ordonnance de 1681, section 12, page 81).
In the Maria, Sir William Scott said:
“I stand with confidence upon all fair principles of reason— upon the distinct authority of Yattel — upon the institutes of *107 other great maritime countries, as well as those of our own country — when I venture to lay it down that, by the law of nations as now understood, a deliberate and continued resisttance to search, on the part of a neutral vessel to a lawful cruiser, is followed by the legal consequence of confiscation.” (1 C. Rob., p. 340.)
In the case of the Catharina Elizabeth (5 C. Rob., p. 232) the same eminent judge held that resistance by an enemy master will not affect his neutral cargo — a decision quite in harmony withthatof theSupreme Oourtin the Nereid — and he observed:
“If a neutral master attempts a rescue, he violates a duty which is imposed upon him by the laws of nations, to submit to come in for inquiry as to the property of the ship or cargo; and if he violates that obligation by a recurrence to force, the consequence will undoubtedly reach the property of his owner; and it would, I think, extend to the confiscation of the whole cargo intrusted to his care and thus fraudulently attempted to be withdrawn from the rights of war. With an enemy master the case is very different.” (See also the Dispatch, 3 C. Rob., p. 278.)
Dr. Phillimore, commenting upon Sir William Scott’s opinion in the Maria, that “it is a wild, conceit that wherever force is used it may be lawfully resisted,” concludes thus:
“It is upon these principles that international, law universally, by its accredited voice, inflicts the penalty of confiscation upon the neutral merchantman or private vessel which resists the belligerent’s right of search.” (Vol. m, § cccxxxvn.)
Proceeding then to consider the case of a private vessel under convoy, he uses and apparently adopts the language of Sir William Scott in what the author describes as “one of his most careful and best reasoned judgments,” that given in the case of the Maria, a vessel sailing under armed convoy for the purpose of resisting visitation and search.
In his treatise on international law Mr. Hall, citing Mr. Justice Story’s opinion in the Nereid, concludes that “on this point, as usually, English and American writers and judges are fully in accord” (Part IV, Chap X, p. 679).
Further (§ 275), he holds that, if the belligerent be within his rights when visiting, “the neutral master is guilty of an unprovoked aggression in using force to prevent the visit from being accomplished, and the belligerent may consequently treat him as an enemy and confiscate his ship.”
*108 In the nnreported case of the Sampson, decided by the lords of appeal, alluded to in the Maria and the Nereid and cited by Mr. Dana, it was decided that the bare fact of being found under enemy convoy afforded a conclusive presumption of intent to deprive the other belligerent of the right to search.
In Manning’s Commentaries on the Law of Nations (p. 3G9) Ave find his views thus stated:
“As a general principle I think that the sailing under the convoy of a belligerent must be regarded as a withdrawal from the search of the other belligerent, as a resistance to his rights, and as entailing confiscation as a consequence of such attempted evasion.”
Ortolan, speaking of the Danish case, excuses the acts of the American ships upon the ground of an innocent ruse, excusable from the desire they had of escaping from the rigor of the French decrees, but he says that, apart from the special circumstances of this case—
“It can not be said that the fact of a neutral vessel navigating under the convoy of a belligerent is not an irregular and even illegal act. Such a convoy can not, at all events, exempt from visit.” (Ortolan, Diplomatic de la Mer, tome h, p. 243.)
Hautefeuille takes a different view, viz, that the neutral who places himself under belligerent convoy does not fail in his duty or violate his neutral character; he exposes himself to be taken with the belligerent convoy, but is not subject to confiscation; to go free it should be sufficient to establish his nationality and the innocence of his trade (Droits des nations neutres, tome iii, pp. 162,164). This author, however, treats the subject rather as a philosopher than as a jurist, and does not assume that the law as stated by him was the law actually in existence, but rather that which he thought should exist and be enforced.
The authorities agree that visit and search in time of war are belligerent rights of self-preservation to which the neutral must submit; that actual resistence by the neutral to the exercise of this right authorizes condemnation; that voluntary submission to belligerent convoy is constructive resistance which authorizes seizure. So far the authorities are united; but they are not agreed as to the result of this constructive resistance, whether it raises a conclusive presumption authorizing confiscation of the neutral or presents only a suspicious *109 circumstance capable of explanation. Tbe weiglit of authority, however, is adverse to this claimant, and we accordingly hold that, in the year 1798, a neutral vessel, if captured when actually under the protection of an enemy’s vessel of war, is for that reason alone good prize.
It has been urged that a statute of the United States authorized resistance by our merchantmen to French visitation. and search, to which there is the simple answer that no single State can change the law of nations by its municipal regulations. i
We do not forget the great dangers incurred by neutrals during the wars of the last century, arising somewhat from the illegal acts of belligerent armed public vessels, but especially from privateers and the inexcusable course of some of the prize tribunals. We have already commented upon this condition of affairs in former opinions, and we are agreed that acts of neutral vessels of commerce'under the then existing dangers should be judged with leniency; but we find that under the law of nations, as declared and observed in 1798, the United States could not have prosecuted to a successful issue the case of the Nancy after it had been shown that, when taken, she was voluntarily under the protection of an English armed vessel.
The case will be reported to Congress with the conclusion of law that the claimant is not entitled to indemnity.