Howry, J.,
delivered the opinion of the court:
The schooner Jane, Sorenson, master, sailed from Baltimore, Md., on Juty 15,1799, bound for Curasao. While peacefully pursuing her voyage July 27,1799, the schooner was captured on the high seas by the French privateer Alliance and taken to Porto Kieo, whore both vessel and cargo were condemned by decree of the French prize tribunal sitting at Basse Terre, Guadeloupe, on September 13, 1799. The vessel and cargo became a total loss to the owners by virtue of the condemnation. The grounds set forth in the decree of condemnation were that the schooner had a letter of marque, that she was without any role d’équipage, and that one of the invoices shipped on board proved to be two trunks of English ginghams.
The master’s protest details the capture of his schooner in the following language:
!t They descried a sail to windward, which immediately gave chase to us, while we made all sail to get away from her; but she soon came up with and fired a gun at us, when we discovered her to be a cruiser, and immediately hove to, while she (the cruiser) fired another gun with ball and some musketry at us, which we returned with one gun, and the privateer continuing to fire her great guns and small arms, which damaged our sails, we were obliged, for the safety of our lives, to haul down our colors.”
It is not necessary, in the view of the court, to notice the grounds of decision by the prize tribunal, except as it relates to the matter of search.
The right of visitation and search of neutral vessels at sea *28 is a belligerent right, essential to the exercise of the right of capturing enemy’s property, contraband of war, and vessels committing a breach of blockade. • It is essential, in order to determine whether the ships themselves are neutral and documented as such, according to the law of nations and treaties, even if the right of capturing enemy’s property be ever' so strictly limited.
The practice of maritime captures could not exist without the privilege, and accordingly the leading sea powers of the world framed their regulations in assertion of the right. It was the undisputed rule of the British Admiralty, according to an order of the council (1664, art. 12, and affirmed bjr proclamation in 1672) which directed that when any ship met withal by the royal nav3r shall fight or make resistance the ship and goods should be adjudged lawful prize. The French had previousty (1681) set the example by a declaration in their celebrated ordinance of marine that every vessel should be good prize in case of resistance and combat. Resistance alone under this ordinance was deemed sufficient b}r Yalin in his Commentary (81), but the Spanish ordinance of 1718, which, the authorities say, was copied from the French ordinance, expressed it in the disjunctive, “in case of resistance or combat.” (Dana’s Wheat. Inter. L., 8th ed., sec. 526.)
Three principles were established in the high court of admiralty in the memorable ease of The Maria (1 C. Rob., 340). These were that the right of visiting and searching merchant ships on the high seas was an incontestable right of the lawfully mentioned cruisers of a belligerent nation, that the authority of a neutral sovereign being interposed could not legally vary the right of a lawfully mentioned belligerent cruiser, and that the penalty for the violent contravention of the belligerent right was confiscation of the property so withheld from visitation and search. In that decision, delivered in June, 179!), the vessel was condemned for sailing under convoy of an armed ship for the purpose of resisting visitation and search. The international rule on the subject is conceded by text writers to have been most ably summed up by the judgment in that case, and decisions since then have mainly followed in approval of the reasons there given for the judgment of the court. So that it has come to be accepted *29 as a settled rule (stated by Sir William Scott, upon the authority of Yattel, the institutions of his own and other maritime countries) that the deliberate and continued resistance of search on the part of a neutral vessel to a lawful cruiser will always be followed by the legal consequence of confiscation.
The detention of a neutral vessel is to ascertain, not by the flag merely, which may be fraudulently assumed, but bjr the documents themselves on board, whether she is really neutral. The object of searching ostensible neutrals is to get evidence as to the fact of neutrality and if the cargo be not enemy’s property; or if neutral, whether they are carrying contraband; or whether the vessels are in the service of the enemy in the way of carrj’ing military persons or dispatches or sailing in prosecution of an intent to break blockade. It is sometimes necessary to examine papers and inspect the vessels as well as the cargoes and persons on board, and the question as to the propriety of the capture of each vessel is a mixed question of law and fact.
This right of search is the right of force, though of lawful force, and u a lawful force can not bo lawfully resisted.” But the Jane undertook to resist. Before sailing she was provided with a commission. Presumptive^ she bore this commission to subdue and capture French vessels under the act of July 9, 1798, 1 Stat. L., 578 (which was enacted to further protect the commerce of the United States). True, this act had no international force. The powers not only did not recognize it as possessing any significance, but this court has since declared that no single State could change the law of nations by its municipal regulations. (The Nancy, 27 C. Cls. R., 99.) As the rules of international law determine and control parties with reference to their rights on the high seas (The Ship Rose, 36 C. Cls. R., 290), so it follows that the right given by the domestic statute to oppose and defend against any search, restraint, or seizure gave way to the international rule. The right of defense was subordinated to the right of search.
Whatever the purpose of the Jane in bearing a commission, the fact remains she did resist. Her master was prevented from successfully acting upon his instructions only by an irresistible force. He did the best he could to resist by the fire of one gun and only struck his colors when there was no help *30 for it. Under these circumstances Ms acts were acts of resistance and of combat, as far as he could resist and fight.
The attempt to avoid search failed because of the superior speed of the cruiser, which fired a gun at the fleeing vessel. The fire of that gun was intended to cause detention. The master of the vessel in flight hove to only when the cruiser came up, the latter firing another gun with ball and musketry. It does- not appear that any damage was done or intended to be done by the second fire be37ond an exercise of the force necessary on the part of the cruiser to compel obedience to search. The Jane returned the fire, and hauled down her colors, not from choice, but necessitj1-. Can it be doubted from the master’s statement that this case would not have arisen had the master been able to make a successful fight?
When, in the determination of these cases, this court undertakes to differentiate the degrees of resistance we tread upon uncertain ground. We invade the right of the belligerent to protect itself against the possible unlawful acts of a neutral, and this can not be safety done without running counter to those rules which every nation claims for itself to protect its authority and power against those seeking to destroy it and those aiding in the attempt.
For the reasons given the court decides, as a conclusion of law, that the seizure was lawful and that the owners and insurers had no valid claim of indemnity upon the French Government prior to the ratification of the convention between the United States and the French Republic, concluded on the 30th da}*- of September, 1830, and that the claims were not relinquished to France by the Government of the United States by said treaty in part consideration of the relinquishment of certain national claims of France against the United States, and that the claimants are not entitled to recover from the United States.
The findings of fact, with a copy of this opinion, will be certified to Congress in accordance with the terms of the statute.