Peelle, Ch. J.,
delivered the opinion of the court:
The question of law presented arises on the claimants’ motion for a new trial, assigning as ground therefor error of the court in its conclusion on the facts found, that the claimants were not entitled to indemnity.
The findings originally filed are withdrawn and the new findings, as above set forth, are now filed with this opinion.
The question as stated by the claimant is, “ Did the resistance of an American merchantman, between the years 1796 and 1800, to search by the crew of an armed ship flying the French flag, raise a conclusive presumption of her guilt as a carrier of-contraband of war for Great Britain, the enemy of France? ”
The question, though revivified by able argument, is not a new one, and has heretofore been considered by this court, but we will review the authorities and further consider the question.
In the case of The Nancy (27 C. Cls. R., 99) the vessel sailed from Baltimore in 1797 and was captured by an English ship and sent to St. Nicholas Mole, from which port the master was ordered not to depart without a convoy. Afterwards The Nancy sailed under the escort of an English privateer for Jeremie and on her return to the Mole under escort was captured by a French privateer, in respect to which the coiirt said:
“ The question whether a neutral vessel laden with a' neutral cargo is liable to condemnation if captured under enemy convoy has never been directly determined; but on a review of the cases and elementary writers, it is now held that if captured when actually and voluntarily under the protection of an enemy she is liable.”
Had The Nancy been sailing under the convoy of an American vessel of war she might not have been subject to visitation (Hall’s Int. L., sec. 272); but that question was not before the court, as the vessel had sailed under the convoy of an English vessel, which was, of course, for protec *264 tion against seizure by France and necessarily against the right of search. The Nancy had associated herself with a hostile force, and upon that she relied for protection and was, therefore, pro hac vice to be considered as an enemy. (The Fanny, 1 Dodson, 448; Hall’s Int. L., sec. 275.)
The question of resistance to search was first considered by this court in the case of The Ship Rose (36 C. Cls. R., 200, 297). The Bose was armed, and her captain bore a commission from the President authorizing him to capture French armed vessels. On her voyage she encountered a French armed cruiser, and the two engaged in action for two and one-half hours, the Rose losing her mate and two men, and 14 wounded, while the French cruiser lost 25 killed and 21 wounded, though the Rose was captured and taken into Guadaloupe, where she was condemned as good prize on the ground of said commission, by virtue of which it was decreed that “ said vessel not only did not obey the summons of the French privateer, but attacked it and defended himself until he was subdued by force of arms.” By reason of said resistance this court held that the vessel was lawfully condemned, and the claimants therefore were not entitled to indemnity, although no contraband was -aboard.
That case was followed by the case of The Ship Amazon (36 C. Cls. R., 378, 391). The Amazon was also an armed vessel and resisted search, and for that reason the claimants were held not entitled to indemnity.
In the case of The Schooner Jane (37 C. Cls. R., 24, 30) the American vessel was armed and bore a commission and resisted visitation by flight from an unknown vessel until it was discovered to be a French privateer, when she hove to and was fired upon, which fire she returned and was subsequcntty captured, and her acts were held resistance to search justifying her condemnation.
In the case of The Schooner Mary (37 C. Cls. R., 33, 37) the vessel had been seized by a French privateer, but on the following day her master and crew overpowered the captors and carried her into Tortola, where the master, being unable to put to sea for want of sufficient crew, sold the vessel and cargo at a sacrifice, and the owners sought indemnity for their loss. It was held that the rescue of the vessel by her *265 master and crew was unlawful, as the right to search a neutral vessel carried with it the correlative duty of submitting to search. (The Catherine Elizabeth, 5 C. Rob., 232; The Dispatch, 3 C. Rob., 278, and note.)
Such have been the decisions of this court, founded, as we believe, upon sound principles of international law, as announced both by text writers and by courts. That is to say, the court recognized the rule that “ to enforce the rights of belligerent nations against the delinquencies of neutrals” they may in self-preservation exercise the right of visitation and search. The right is “ founded upon necessity, and is strictly and exclusively a war right, and does not rightfully exist in time of peace unless conferred by treaty.” (1 Kent Com., p. 153 et seq.)
The right to visit and search a merchant vessel upon the high seas, whatever be her cargo and wherever bound, is an incontestable right belonging to the lawfully commissioned cruisers of a belligerent. On the other hand, where a vessel and cargo when examined prove to be neutral — i. e., in no way transgress the rights of a belligerent by way of resistance or otherwise — the right of search is exhausted and the vessel must be permitted to proceed,. (Sec. 526, Wheaton’s International Law.)
The right of visitation and search negatives the idea of resistance, and hence resistance by the master of a vessel— except in case of extreme violence threatened by a cruiser abusing his commission — would be unlawful. (1 Kent Com., supra.)
As is said by Hall on International Law (section 275) :
“ The right of capture on the ground of resistance to visit, and that of subsequent confiscation, flow necessarily from the lawfulness of visit, and give rise to no question. If the belligerent when visiting is in the rights possessed by a State in amity with the country to which the neutral ship belongs, the neutral master is guilty of an unprovoked aggression in using force to prevent the visit from being accomplished, and the belligerent may consequently treat him as an enemy and confiscate his ship.”
“ The only point arising out of this cause of seizure which requires to be noticed is the effect of resistance upon cargo when made by the master of the vessel, or upon vessel and cargo together when made by the officer commanding a con *266 voy. The English and American courts, which alone seem to have had an opportunity of deciding in the matter, are agreed in looking upon the resistance of a neutral master as involving goods in the fate of the vessel in which they are loaded, and of an officer in charge as condemning the whole property placed under his protection. ‘ I stand with confidence,’ said Lord Stowell, ‘ upon all principles of reason, upon the distinct authority of Yattel upon the institutes of other great maritime countries, as well as those of our own country, when I venture to lay it down that by the law of nations, as now understood, a deliberate and continued resistance to search, on the part of a neutral vessel, to a lawful cruiser is followed by the legal consequences of confiscation.’ ” (Sec. 526, Wheaton’s International Law.)
See the case of The Maria (1 C. Rob., 340, 377) ; The Elsabe (4 C. Rob., 409).
The court is now asked by the claimant to reverse its ruling above announced on the ground that the capture of American vessels from 1796 to 1800 by French privateers during the war between France and England were in the nature of reprisals.
The case was argued with great force and learning, counsel reviewing the history of the times from 1754, when Washington, kindling “ the first great war of revolution,” fought the battle of Great Meadows, down through our Revolutionary period and the war between England and France, which culminated with Waterloo in 1815. Reference was made to the struggle of the colonies with Great Britain and the alliance with France by the treaty of 1778, which latter, he says, was abandoned by the United States in their treaty with Great Britain in 1795; that the losses to France by reason of the treaty of 1795 caused, if they did not justify, France in adopting the policy of seizing American merchantmen on the high seas by way of reprisal.
In respect to the defense of resistance to search the claimant says :
“ Throughout this litigation it appears to have been assumed that the relations of America toward France during this period from 1796 to 1800 were solely those of a neutral toward a belligerent, and that if America suffered injury from France it was because France abused her belligerent rights. * * * The fallacy of the contention of the Government lies in the proposition which is implied in every *267 argument, that nations must either be at war or at peace, and that if America was not at war with France she must have been at peace with France, and therefore had no right to resist the French claim as a belligerent to search for contraband of war in American ships.
“ Setting aside for the moment the legal limitations of the right of search and the manner in which France disregarded these limitations, I submit that it is a fundamental misconception of law to assume that nations must be at war or absolutely at peace. There is a perfectly recognized and well-established intermediate condition known as a condition of reprisals, which is subject to its own code. This condition of reprisals arises when a nation which conceives itself to bo wronged by another proceeds to redress its own injuries by seizures. Necessarily, differences arise which lead to armed collisions. The relations between the two States then bo-come equivocal. If war follow, then the declaration of war is held to be a declaration of animus from the outset, and all claims for damages are merged in one general loss by war. If, on the contrary, the reprisals be terminated by a reconciliation, then the peaceful animus relates back, and mutual compensation for loss is provided for. This was the doctrine laid down by Lord Stowell in the Boedes Lust (5 C. Lobin-són, 233). It is also the theory of general international law as expounded by Wheaton, who has thus described reprisals:
“ ‘Among the various modes of terminating the differences between nations, by forcible means short of actual war, are the following:
* * * * * * *
“ ‘ 4. By making reprisals upon the persons and things belonging to the offending nation, until a satisfactory reparation is made for the alleged injury.’
* * * * * * *
“ General reprisals are ‘ when a state which has received, or supposes it has received, an injury from another nation, delivers commissions' to its officers and subjects to take the persons and property belonging to the other nation wherever the same may be found.’
* * * * * * *
“ ‘ The effects thus seized are preserved, while there is any hope of obtaining satisfaction or justice. * * * If the two nations upon this ground of quarrel come to an open rupture, satisfaction is considered as refused from the moment that war is declared, or hostilities commenced; and then, also, the effects seized may be confiscated.’ (Elements of International Law, Wheaton, secs. 290, 291, 292; the Boedes Lust, 5 C. Robinson, 246.)” 1
*268 To justify reprisals some specific wrong must be committed and the seizure must be made by way of compensation in value for such wrong. In other words, as a means of satisfaction without resort to actual war letters of marque are, or Avere formerly, issued by the state to certain of her citizens authorizing them to seize and take the person and property of the citizens of the offending state wherever found. But such reprisals when thus made will not become complete, justifying confiscation, until after hope of satisfaction has ceased or actual war has begun. (Vattel, book 2, sec. 342, et seq.)
In adjusting the claims under the act of our jurisdiction we must consider the questions in their relation to the actual state of facts existing at the time the losses occurred and as they were subsequently considered and determined by France and the United States by their treaty of September 30, 1800.
While reprisals are acts of Avar in fact, it is for the state affected to determine for itself whether the relation of actual. Avar was intended by them; and if it so elects to regard such acts then the property so seized becomes liable to confiscation at once; .otherwise it is to be held until hope of satisfaction has ceased.
As a matter of fact, however, neither France nor the United States treated the captures by French privateers as reprisals looking to indemnity for wrongs committed by the United States, but were, so far as avo are adAÚsed, made upon the theory that American vessels Avere carrying contraband to aid England in her Avar Avith France, or Avere violating some t.eaty obligation betAveen the United States and France or some regulation of the French Government against carrying English goods or from entering English ports. Nowhere was it claimed that France was authorizing privateers to prey upon American commerce because of rights under the treaty of 1778, of which she >vas deprived by the Jay treaty of 1795. On the contrary, almost invariably upon the capture of an American vessel the captor would at once take the property in and have it condemned as good prize by a French prize court, followed by an order for the sale of the property and the appropriation of the proceeds.
*269 Referring to the treaties of 1778, the court, in the case of Gray (21 C. Cls. R., 343, 350), said:
“ The treaties of 1778 were two in number; that of 1 alliance,’ the one of most immediate, and, in fact, at that time of absolutely vital importance to the United States; and that of ‘ amity and commerce.’ While separate instruments, they were concluded upon the same day, were the result of the. same negotiations, signed by the same plenipotentiaries, and are, in diplomatic effect, one instrument. The treaty of alliance, after referring to its companion, the treaty of commerce, states that the two powers ‘ have thought it necessary to take into consideration the means of strengthening the engagements therein made,’ arid of ‘ rendering them useful to the safety and tranquillity of the two parties; particularly in case Great Britain, in resentment of that connection, * * * should break the peace with France, either by direct hostilities or by hindering her commerce and navigation in a manner contrary to the rights of nations and the peace subsisting between the two Crowns; ’ and the two powers, resolving in such case to join against the common enemy, determined upon the treaty, which provided that if war should break out between France and Great Britain during the war for American independence, each party should aid the other according to the exigencies, as good and faithful allies; that the essential end of the alliance, called a £ defensive ’ alliance, was the ‘ liberty, sovereignty, and independence, absolute and unlimited, of the United States.’ ”
* * * * * * *
“ The provisions of the other agreement, the treaty of commerce, of importance in this case (alluding to them briefly) required protection of merchantmen; required ships of war or privateers of the one party to do no injury to the other; and provided especial, purely exceptional, and exclusive privileges by' each party to the other as to ships of war and privateers bringing prizes into port._
“ The treaty of alliance was not one-sided, for it imposed upon the United States a possible duty and burden in the fulfillment of the guarantee of French possessions in America ‘ forever ’ against all other powers. This issue was presented without delay. The French revolution began; in 1793 the King was beheaded, when France was instantly brought face to face with the powers of Europe, and her possessions in America were soon wrested from her.”
Under the authority of that treaty France claimed the right to and actually did commission such persons in the United States as would fit out cruisers in our ports to prey *270 upon English commerce, thereby attempting to usurp the sovereign power of the United States. (Gray's case, 21 C. Cls. R., 353.) By the decrees of May 9,1798, and November 18, 1794, referred to in that case, France directed the seizure of neutral vessels, although the treaty of 1778 expressly provided that “ free ships make free goods.”
Thus American vessels were seized while the treaty of 1778 was in full force; and after the treaty of 1795 and the act of July 7, supra, abrogating the treaty of 1778, seizures were continued practically on the same ground as before. Indeed, France continued to regard the treaty of 1778 in full force (Schooner John, 22 C. Cls. R., 408, 456), and one of the grounds assigned for the condemnation of the vessel in the present case is for a violation of that treaty respecting the role d’équipage, so that such seizures can not be said to have been made by way of reprisals to indemnify France for any losses she may have sustained by the modification or abrogation of the treaty of 1778. On the contrary, France abrogated so much of the treaty of 1778 as related to contraband goods on neutral vessels; and while such abrogation justified French cruisers in seizing and her own courts in condemning vessels, such course did not abrogate any treaty right of the United States, as was held by this court in the case of the Ship James and William (37 C. Cls. R., 303). This act of France was followed by the act of July 7, 1798 (1 Stat. L., 578), wherein Congress abrogated the treaty of 1778 in toto, thereby relieving France from all obligation under it.
And two days later Congress passed the act of July 9,1798 (1 Stat. L., 578), entitled “An act to protect the commerce of the'United States,” by the first section of which the President was authorized to instruct the commanders of public armed vessels in the employ of the United States “ to subdue, seize, and take any armed French vessel which shall be found within the jurisdictional limits of the United States, or elsewhere on the high seas, and such captured vessel, with her apparel, guns, and appurtenances, and the goods or effects which shall be found on board the same, being French property, shall be brought within some port of the United States, and shall be duly proceeded against and condemned as *271 forfeited, and sliall accrue and be distributed as by law is or shall be provided respecting the captures which shall be made by the public armed vessels of the United States.”
By section 2 of the same act the President was authorized — - “ to grant to the owners of private armed ships and vessels of the United States, who shall make application therefor, special commissions in the form which he shall direct, and under the seal of the United States; and such private armed vessels, when duly commissioned, as aforesaid, shall have the same license and authority for the subduing, seizing, and capturing any armed French vessel, and for the recapture of the vessels, goods, and effects of the people of the United States, as the public armed vessels of the United States may by law have; and shall be in like manner, subject to such instructions as shall be ordered by the President of the United States, for the regulation of their conduct.”
And by section 5 provision was made for the forfeiture and condemnation of such armed French vessels and the distribution of the proceeds arising from the.sale thereof among the captors as they may have agreed ; -or if there be no such agreement then the distribution to be made within the discretion of the prize court.
In the case of Bas v. Tingy (4 Dall., 37, 41) the judges, in commenting on the foregoing statutes, as well as other statutes referred to by them, respecting the relations of the United States to France, held that a state of hostility did exist between the United States and France, and that France was property designated in the act of Congress to which they refer (Mar. 2, 1799, 1 Stat. L., 709, 716) as an enemy, Mr. Justice Washington saying:
“ Now, if this be the true definition of Avar, let us see what was the situation of the United States in relation to France, in March, 1799, Congress had raised an army; stopped all intercourse Avith France; dissolved our treaty; built and equipped ships of Avar and commissioned private armed ships; enjoined the former and authorizing the latter to defend themselves against the armed ships of France, to attack them on the high seas, to subdue and take them as prizes, and to recapture armed vessels found in their possession. Here, .then, let us ask what were the technical characters of an American and French armed vessel combating on the high seas, with a view the one to subdue the other and to make prize of his property ? They certainly were not friends, *272 because there was a contention by force, nor were they private enemies, because the contention was external and authorized by the legitimate authority of the two Governments. If they were not our enemies I know not what constitutes an enemy.”
In respect to the same subject, Mr. Justice Chase, in the case last cited, page 43, said:
“ What, then, is the nature of the contest subsisting between America and France? In my judgment, it is a limited, partial Avar. Congress has not declared war in general terms,' but Congress has authorized hostilities on the high seas by certain persons in certain cases. There is no authority given to commit hostilities on land, to capture unarmed French vessels, nor even to capture French armed vessels lying in a French port; and the authority is not given indiscriminately to. every citizen of America against every citizen of France, but only to citizens appointed by commissions or exposed to immediate outrage and violence. So far it is unquestionably a partial war, but, nevertheless, it is a public war, on account of the public authority from which it emanates.” (See also the case of the ship Amelia, 1 Cranch, 1, 8.)
The legislation of Congress referred to was evidently intended to meet, combat, and prevent by force the forcible capture of American vessels by French privateers, and to that extent was retaliatory, but no authority was given to prey upon French commerce or to invade French territory. Such acts in their nature not only authorized resistance to search and capture, but authorized the capture of French armed vessels by way of retaliation for Avrongs committed by the French on American commerce, and to that extent may be termed reprisals; but such reprisals on behalf of the United States were limited in their nature and hardly amounted to more than was justified by the natural law of self-defense, as was held in the case of Cushing, Administrator (22 C. Cls., 1, 37; The Maria, 1 C. Rob., 340-374).
But we must keep in mind that the statutes to which we have referred respecting the authority of Congress to authorize American merchant vessels to defend against French depredations did not change the law. of nations' or impose a new international obligation upon France as was held in the case of The Ship Rose, supra, p. 283. In that case it *273 was urged that the belligerent, in making- the attack, was not in the exercise of the legal right of search, but that the object and purpose of the assault was the seizure and condemnation without reference to the neutrality of the vessel engaged in peaceful and lawful commerce, in respect to which the court said:
“ The claimants are treading on very dangerous ground when they urge the higher law of self-preservation. Self-defense is founded on the theory that it is the only remedy, and that, being the only remedy, it presupposes the absence of all laAv protecting the rights of him who asserts the prerogative of self-defense. If the right of self-defense prevailed to the extent of repelling force by force, and was incident to the .crew.of the ship captured, then all other law was silent and Avar prevailed, which condition would be most disastrous to the case of the claimants.”
-This court early held that the seizure of American vessels on the ground that they were armed for defensive purposes was not justified. (Schooner Industry, 22 C. Cls., 1, 38.) But that does not mean that such armed vessels were justified under the rules of international law in resisting search— repelling force by force. The court has proceeded upon the theory in all the awards thus far made that the relation of the United States toAvard France, during her war with England, was that of a neutral toward a belligerent, thus recognizing the incontestible right of France to visit and search American vessels to guard against and prevent any assistance being given to her enemy contrary to the rules of international law.
In view of the authorities'and the legislation of Congress to which we have referred, it is apparent that the theory adopted by the court was most advantageous to the claimants, as the legislation of Congress authorizing the arming of merchant vessels — coupled with. commissions from the President — to seize French armed vessels and recapture American vessels was rather the act of an enemy than that of a neutral. And though France, by the legislation referred to, was designated as an enemy, and hostilities were authorized by certain persons in certain cases, the war thus carried on Avas held limited in its nature, and for that reason and that alone the court has recognized the right of *274 France, a belligerent, to visit and search American vessels— that is to say, the court’s ruling in effect has been that the United States did not elect to treat the acts of France in capturing our vessels as acts of war or reprisals, but treated' them as acts in the exercise of the belligerent right of visit and search of the vessels of a neutral.
This view — as to the character of the ^claims — is supported by the act of our jurisdiction, which recognizes claims “ arising out of illegal captures, detentions, seizures, condemnations, and confiscations prior to the ratification ” of the treaty of 1800. Only such claims as grew out of the illegal acts of France prior to that treaty are recognized by the act, so that such claims rest upon international law and treaty rights.
As was said in the case of the Schooner John (22 C. Cls., 408, 456)—
“ France did not contend that the Jay treaty abrogated the treaties of 1778; on the contrary, her whole argument, down to the ratification of the treaty of 1800, was based upon the premise that these treaties were of enduring force. * * * France did not deny at any point of the negotiations which led to the treaty of 1800 her liability for claims known by the generic name of ‘ spoliations,’ but claimed in return for payment recognition of treaties, a demand which was not granted, and the contention remained embodied in the second article, which was stricken out. Thus was completed what Madison called the ‘ bargain ’ by Avhich we released ‘ spoliations ’ in consideration of release from all obligations founded upon the treaties of 1778. * * * To term the decrees of France and the acts of their privateers under them £ acts of reprisal ’ does not alter the facts or the legal position. That position has been defined by the Supreme Court of the United States as limited partial war. We, following the path indicated by that tribunal, have defined it as ‘ limited war in its nature similar to a prolonged series of reprisals.’ The result of that partial limited war, the result of the negotiations for settlement, the agreement reached by the two parties which made the Government of the United States liable over to its citizens we have heretofore considered so much in detail that we shall not now repeat it, and we need only state briefly the result heretofore reached by us, and in which we, after reexamination, are confirmed, that the acts of France now in question, whether called ‘ reprisals ’ or acts of limited warfare, were *275 contended by the United States to be illegal, were admitted so to be by France; that France stood ready to make the compensation made by England and Spain for similar acts on their part, provided we would admit certain claims of her oAvn, which we declined to do; and finally, by the sub: stitution of the existing second article of the treaty for that agreed upon by the negotiators, these claims were surrendered in consideration of a release from the French demand.”
It will thus be seen that the character of these claims, whether considered as reprisals or otherwise, have heretofore been considered by this court and a conclusion reached adverse to the claimants, i. e., that the captures were illegal and so conceded to be by France.
If the captures from 1796 to 1800 be treated as reprisals justifying resistance, the United States did not.elect to regard such captures as acts of war unless the acts of Congress referred to be so considered, and if they be so considered then war prevailed and the captures became lawful prizes of war. But Congress, in whom the power resides, did not see lit to declare war, and the actual hostilities carried on were not only limited but were of a defensive character; so that the court must adhere to its former rulings respecting the liability of France for the illegal capture of American vessels.
That is to say, the liability of France under the act of our jurisdiction must be determined-upon the basis of her illegal acts, the United States in their capacity as a neutral recognizing the belligerent right of France to visit and search American vessels; and that such right can not be transformed into a wrong by means of resistance thereto, whether such resistance be successful or otherwise. Hence, resistance to search renders a vessel liable to confiscation; the degrees of which the court can not differentiate without invading the right of the belligerent to protect itself against the possible unlawful acts of a neutral, as was held in the case of the Schooner Jane (37 C. Cls., 24, 30).
The convention of September 30, 1800 (8 Stat. L., 178), was based on the desire to terminate not war but “ the differences which have arisen between the two States.” France recognized her liability for the illegal acts of her privateers, and was willing to release her claim against the United *276 States in consideration of the release by tire United States of the liability of Franco to American citizens. Upon this theory the act of our jurisdiction (23 Stat. L., 283) was passed. Congress did not thereby recognize them as claims originating in war. On the contrary, section 1 of the act provides:
“ That such citizens of the United States, or their legal representatives, as had valid claims to indemnity upon the French Government arising out of illegal captures, detentions, seizures, condemnations, and confiscations prior to the ratification of the convention between the United States and the French Republic concluded on the thirtieth day of September, eighteen hundred, the ratifications of which were exchanged on the thirty-first day of July following, may apply by petition to the Court of Claims, within two years from the passage of this act, as hereinafter provided.”
Therefore, in the consideration of these French spoliation claims the court has followed the executive and political departments of the Government in treating them as claims arising out of the illegal acts of France and not as claims originating in war.
Now, to apply what we have said: On October 11, 1799, while sailing under convoy from Demarara by the way of Martinico, St. Kitts, and Tortola, and after leaving the latter place and after parting from the convoy, the schooner Endeavor, whose master bore a letter of marque, was fired upon by a French privateer, La Victor, Mace, master, under French national colors, after which the master of the Endeavor “ put himself in the best order of defense and commenced firing his stern chaser; that upon his firing the second gun the privateer struck national and hoisted the blood]7 flag.” The master of the Endeavor “ then struck his colors, hoisted out his boat, and went on board the privateer with his papers,” and a prize master and crew were placed on board the Endeaoor. The master of the Endeavor and his crew were then transferred to the privateer and the prize master was ordered to conduct the Endeavor to Porto Rico, and while on the way thither the Endeavor was retaken by an English frigate, who took out a salvage of one-eighth of the estimated value of the cargo in coffee and then turned her over to her mate. On *277 November 15, 1799-, the Endeavor was again taken by a French privateer, The Alliance, who put five men on board and ordered her to Porto Rico, where she arrived three days later. Upon the arrival of the vessel at Porto Rico the máte who had succeeded to the duties of the master (Brig George, 1 Sumner R., 151, 156) was imprisoned without money or friends and on. December 24,1799, at St. Thomas, after being released, he entered a protest, and from thence he returned to his home in Norfolk, Ya.
The Endeavor and her cargo were then subsequently condemned as good prize for the benefit of the owners and crew of The Alliance by decree of the tribunal of commerce and prizes sitting at Basseterre, in the Island of Guadeloupe, in the month of January, 1800, and thereby became a total loss to the owners. One. of the grounds of condemnation recited in the decree was that the vessel did not have on board a role d’équipage in due form as required by the treaty of 1778, and, further, the condition of vessels as regards their character as neutral or enemy shall.be determined by their cargoes, and if found at sea and-loaded in whole or in part with merchandise the product of England or her colonies will be declared good prize no matter who- may be the owners of said goods or merchandise.
Now, while we reach the conclusion that the resistance of the- master at the time of the first capture would have justified the captor in taking the vessel in for adjudication, such capture did nol per ee operate, as between enemies, to divest the title of the captured property; and that until legally condemned, the possession of the property by the government of the captor was in trust (The Flad Oyen, 1 C. Rob., 135; 3 C. Rob., 97; The Henrick and Maria, 4 C. Rob., 43, 53).
True, the resistance to search was at the time of the first, capture, and it was not made a ground of condemnation at the time of the second capture, doubtless for the reason that the capture being made by a different privateer it was unknown to the second captor at the time. But it was a defense which would have been available to France and is, therefore, under the rulings of this court, now available as a defense by the United States. (Ship Joanna, 24 C. Cls., 198, 203.) Tn that case a vessel carrying contraband had *278 been condemned on another ground, and the United States interposed the defense of contraband, which would have been available to France at the time, in respect to which the court said:
“ So in this court, under this peculiar jurisdiction, the defendants are at liberty to show that, while the specific reason set up by the prize court was not valid, as perhaps based upon a statute in derogation of the law of nations, still - other facts appeared which, while not pressed in the prize tribunal, constituted a good defense to a diplomatic claim. The United States here is entitled to the defense which would have belonged to France at the time these claims were assumed.”
Furthermore, on the second capture it is questionable whether the master, as against France, could have escaped the consequences of his resistance on the first capture. (The Maria, 1 C. Rob., 340, 376.) This court, in the case of the Ship Galen (37 C. Cls., 89, 93), held that “ a neutral may forfeit her neutral character by the fraudulent conduct of the master, by false destination, by resisting search.” (See also The Baigorry, 2 Wall., 474, 481.)
In the present case the capture, recapture, and subsequent capture were while the Endeavor was on her return voyage to the United States; and the master, in addition to sailing from Demerara with an armed vessel, under convoy (though .separating from the latter before capture), carried a commission issued by the President of the United States under the act of July 9, 1798 (1 Stat. L., 578), which commission gave the owners of the vessel the same authority for subduing, seizing, and capturing any armed French vessel and to recapture vessels, goods, and effects belonging to the people of the United States as the public armed vessels of the United States had under section 1 of said act.
In the case of The Brig Joseph (8 Cranch, 451), the vessel sailed from Boston with a cargo of freight April 6, 1812, on a voyage to Liverpool and the north of Europe and thence directly or indirectly to the United States. The vessel arrived in Liverpool and there discharged her cargo; on June 30 following with another cargo taken in at Hull she sailed for St. Petersburg under protection of a British license granted June 8, 1812, which authorized the exporta *279 tion to St. Petersburg and the importation of a cargo into England. The vessel arrived at St. Petersburg and there received the news of the war between the United States and Great Britain. October 20, 1812, the vessel sailed from St. Petersburg to London with a cargo consigned to merchants in London, having wintered in Sweden; in the spring of 1813 she sailed under convoy instructions from a British ship for London, where she arrived and delivered her cargo. May 29 she sailed for the United States in ballast under a British license and was captured on July 16* 1813, near Boston light-house by an American privateer and taken into Salem for adjudication, and was condemned. The capture was held valid, and in the syllabus (on the margin of that case) it appears that “ if an American vessel be captured on a circuitous voyage to the United States, in a former part of which voyage she has been guilty of conduct subjecting her to confiscation, though at the time of capture she is committing no illegal act, she must be condemned.” That quotation is cited with approval as paragraph 147 in the Digest, United States Supreme Court Reports, by the Lawyers Co-Operative Publishing Company, volume 4, page 4738.
In referring to the ancient rule respecting the condemnation of a vessel for carrying, contraband goods, the court, in the case of Carrington and others v. The Merchants Insurance Company (8 Pet., 495, 520), by Justice Story, following the case of The Neutralitet (3 Rob. R., 295), said:
“ The policy of modern times has, however, introduced a relaxation on this point, and the general-rule now is that the vessel does not become confiscated for that act. But this rule is liable to exceptions. Where a ship belongs to the owner of the cargo, or where the ship is going on such service under a false destination or false papers, these circumstances of aggravation have been held to constitute excepted cases out of the modern rule, and to continue them under the ancient rule. The cases in which this language was used were cases of capture upon the outward voyage. The same doctrine was afterwards held by the same learned judge to apply to cases where the vessel had sailed with false papers, and a false destination upon the outward voyage, and was captured on the return voyage. And, finally, in the cases of the Rosalia and the Elizabeth, in 1802 (4 Rob. R., note to *280 table of cases), the lords of appeal in prize cases held that the carriage of contraband outward with false papers will affect the return cargo with condemnation. * * * The belligerent has a right to require a frank and bona fide conduct on the part of neutrals in the course of their commerce in times of war; and if the latter will make use of fraud and false papers to elude the just rights of the belligerents, and to cloak their own illegal purposes, there is no injustice in applying to them the penalty of confiscation. The taint of the fraud travels with the party and his offending instrument during the whole course of the voyage and until the enterprise has, in the understanding of the party himself, completely terminated.” (See also the case of The Nereide, 9 Cranch, 388.)
Respecting resistance to search, where the master had sailed under instructions to prevent inquiry and search by force, the court in the case of The Maria (1 C. Rob., supra), by Sir William Scott, said:
“ However that might be, the present fact is that the commander sails with instructions to prevent inquiry and search by force, which instructions he is bound to obey, and which he is prevented from acting upon to their utmost extent only by an irresistible force. Under such circumstances how does the presumption of abandonment arise? If it does, mark the consequences. If he meets with a superior force, he abandons his hostile purpose. If he meets with an inferior force, he carries it into complete effect. How much is this short of the ordinary state of actual hostility ? What is hostility? It is violence where you can use violence with success; and where you can not, it is submission and striking your colors. Nothing can be more clear, upon the perusal of these attestations, than that this gentleman abandoned his purpose merely as a subdued person in an unequal contest. The resistance is carried on as far as it can be, and when it can maintain itself no longer, fugit indignaba.”
In the case of Maley v. Shattuck (3 Cranch, 457, 488), respecting the grounds upon which a vessel may forfeit her neutral character, the court, by Chief Justice Marshall, said:
“ It is well known that a vessel libeled as enemy’s property is condemned as prize if she act in such manner as to forfeit the protection to which she is entitled by her neutral character'. If, for example, a search be resisted, or an attempt be made to enter a blockaded port, the laws of war, as exercised by belligerents, authorize a condemnation as enemy’s *281 property, however clearly it may be proved that the vessel is in truth the vessel of a friend."-+ CD y-i i-i ri r+ P' ‘ O * CD
So here, where the master,by force attempted to prevent visitation and search, he thereby forfeited his neutral character ; and that being so, shall he, while on the same voyage, be dealt with by France as haying reestablished his neutrality by yielding without force to a subsequent capture? We think not. And, therefore, we must hold that the resistance of the master to visitation and search at the time of the iirst capture was available to France as a defense at the time of the second capture, though no illegal act was then committed; and being a defense available to France at the time, it is now available to the United States under the act of our jurisdiction.
But the claimant contends that because the master of the vessel was spirited away, as shown in the findings, and was not examined in 'preparatorio or permitted to be present at the trial, the proceedings were ex parte and, therefore, illegal, notwithstanding the master’s resistance to search. Furthermore, that the mate who succeeded to the duties of the master was imprisoned and not represented at the trial.
In the case of The Anne, Barnabeu (3 Wheat., 435, 447), (a British ship captured by an American privateer during the war between England and the United States in March, 1815), Mr. Justice Story, speaking for the court, said:
“A capture made within neutral waters is, as between enemies, deemed, to all intents and purposes, rightful; it is only by the neutral sovereign that its legal validity can be called in question; and as to him and him only, is it to be considered void. The enemy has no rights whatsoever; and if the neutral sovereign omits or declines to interpose a claim, the property is condemn able, jure belli, to the captors. This is the clear result of the authorities; and the doctrine rests on well-established principles of public law.”
(In a footnote on that same page it is stated: “ The same rule is adhered to in the prize practice of France.”)
That case was cited with approval in the case of The Florida (101 U. S., 37, 42), where it was said:
“A capture in neutral waters is valid as between belligerents. Neither a belligerent owner nor an individual enemy owner can be heard to complain. But the neutral sovereign *282 whose territory has been violated may interpose and demand reparation, and is entitled to have the captured property restored.”
Furthermore, it is there stated that:
“ The title to captured property always vests primarily in the government of the captors. The rights of individuals, where such rights exist, are the results of local law or regulations. Here the capture was promptly disavowed by the United States. They, therefore, never had any title.”
In the case of the Schooner Good Intent (36 C. Cls. R., 262) it is in substance held that the owners of a vessel have the right to defend their property, to show such facts as will establish the illegality of the seizure, and that if they are deprived of that right the condemnation is illegal.
In the case of the Brig Sally (37 C. Cls..R., 74, 78) it was held that if the capture of the vessel was legal “ it was the duty of the captain of the capturing vessel to afford the captain of the Sally every reasonable opportunity to assert and maintain his rights in the proceedings to condemn the vessel founded upon capture.” Again it was there held that “ it is not the seizure which confers the right of property upon a seizing vessel, but it is a judicial determination of the question of the liability of the ship founded upon such seizure.”
In the case of the Snow Thetis (37 C. Cls. R., 470) it was held:
“ Where the decree of the prize tribunal is silent as to the presence of the parties in interest, and there is neither protest nor proof equivalent to it showing that the owners or their agents were denied a hearing, the presumption is that they were present and given an opportunity to defend. But where it can be gathered from the action of the prize court or from proof contemporaneous with the transaction that the proceeding was one of those which justified the American complaint of that period respecting condemnations without notice to vessel owners, no effect will be given to the summary disposition of a vessel under such a decree.”
In the case of the Schooner Maria (39 C. Cls. R., 147, 152) it was in substance held that while the seizure and condemnation of a vessel may have been for good cause, it was the right of the master to be present at the trial; and if *283 prevented by imprisonment from so doing, the proceeding was ex parte and wholly void. “ Nor can it be held that the decree under the circumstances of this case was conclusive on that point, as the condemnation was ex parte and the proceedings illegal.”
In the present case, aside- from the master having by his resistance forfeited his neutral character, we think the owners of the property were represented at the trial. The decree, after stating the capture of the Ship Endeavor from Boston, Nathaniel Griffin, master, recites that “ the examination made •on Frimaire 2d last, on the occasion of said seizure, by Citizen Bébian, delegate in Porto Rico; the analysis of said vessel’s papers in English compared and signed Bébian, by Citizen Menard, assistant sworn interpreter of said language,” from which it may be inferred that the mate, acting master, was examined in preparatorio; but if not, then the • decree “ is silent as to the presence'of the parties; ” and as it is not recited in the protest that the mate was denied a hearing the presumption is, as held in The Snow Thetis, supra, that he was given an opportunity, to defend. The burden is upon the claimant to show that he was not. The mate, though imprisoned at Porto Rico, thereafter in the island of St. Thomas on December 24th,. made his protest, while the condemnation did not take place until January 7th following. Pie was at liberty, so far as appears by the record, to attend the trial in person if he had so desired. We must therefore hold that the condemnation was legal, and the motion for a new trial is overruled. The former findings are withdrawn and new findings now filed.
The findings herein, together with this opinion, will be certified to Congress.