## Case No. 13,799.

### TAYLOR et al. v. MORTON.

[2 Curt. 454.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1855. 2

TREATIES—POLITICAL QUESTION—CUSTOMS DUTIES.

1. Though a treaty is a law of the land, under the constitution of the United States, congress may repeal it, so far as it is a municipal law, provided its subject-matter is within the legislative power of congress.

[Cited in Buckner v. Street, Case No. 2,098; U. S. v. Tobacco Factory, Id. 16,528; U. S. v. Bridleman, 7 Fed. 902; Bartram v. Robertson, 15 Fed. 214; Castro v. De Uriarte, 16 Fed. 97; In re Ah Lung, 18 Fed. 29; The Head-Money Cases, Id. 141; Re Chae Chan Ping, 36 Fed. 434. Approved in dissenting opinions in Scott v. Sandford, 19 How. (60 U. S.) 629, and in Chew Heong v. U. S., 112 U. S. 563, 5 Sup. Ct. 255.]

2. A promise in a treaty, that the products of one country shall not be subjected to a higher rate of duty than like products imported into the United States from other countries, addresses itself to the political and not to the judicial department of the government, and the courts cannot try the question whether it has been observed, or not.

[Cited in Ropes v. Clinch, Case No. 12,041; Netherclift v. Robertson, 27 Fed. 741; North German Lloyd S. S. Co. v. Hedden, 43 Fed. 22. Cited in dissenting opinion in Baldwin v. Franks, 120 U. S. 703, 7 Sup. Ct. 764. Approved in Whitney v. Robertson, 124 U. S. 194, 8 Sup. Ct. 458. Cited in Botiller v. Dominguez, 130 U. S. 247, 9 Sup. Ct. 527. Applied in Chae Chan Ping v. U. S., 130 U. S. 602, 9 Sup. Ct. 628.]

3. Though the treaty with Russia, of December 18, 1832 (8 Stat. 444), stipulated that no higher rate of duties should be imposed on goods imported from Russia than on like articles imported from other places, this court cannot try the question, whether a certain species of hemp, on which a duty of twenty-five dollars per ton is imposed by an act of congress, is "like" Russian hemp, within the meaning of the treaty. This is a question for congress, not for the courts.

[Cited in Cherokee Tobacco v. U. S., 11 Wall. (78 U. S.) 621; Edye v. Robertson, 112 U. S. 598, 5 Sup. Ct. 247.]

This action of assumpsit [by Charles G. Taylor and others], for money had and received, was against [Marcus Morton] the collector of customs of the port of Boston and Charlestown, and came on to be tried before the district judge, at a former term. The parties put in their evidence, and then agreed that the case should be taken from the jury, and submitted to the court, with authority to draw all such inferences of fact as a jury would be authorized to draw from the evidence; and that a verdict should be entered as the court might think proper upon the law and the evidence.

Choate & Bell, for plaintiffs.
Hallett, Dist. Atty., and C. J. Loring, contra.

CURTIS, Circuit Justice. This is an action of assumpsit for money had and received, brought against the defendant as collector of the customs of the port of Boston, to recover back moneys alleged to have been illegally exacted by him in payment of duties, upon a quantity of hemp imported by the plaintiffs from Russia, while the tariff act of 1842 (5 Stat. 548) was in operation. The duties charged were at the rate of forty dollars per ton. The plaintiffs allege that twenty-five dollars per ton was the true rate. The commercial treaty between the United States and Russia of the 18th December, 1832, stipulated, in substance, that no higher rates of duty should be imposed on the products of Russia imported from that country into the United States, than on the like articles imported from other countries. The tariff act of 1842 imposed a duty of forty dollars per ton on all hemp excepting Manilla, Suera, and other hemps of India, on

---

1 [Reported by Hon. B. R. Curtis, Circuit Justice.]
2 [Affirmed in 2 Black (67 U. S.) 481.]

which a duty of twenty-five dollars only was to be levied.

The plaintiff's counsel insists, that the import now in question is, within the meaning of the treaty, an article "like" Bombay hemp; that congress has levied upon Bombay hemp a duty of twenty-five dollars per ton; that as soon as this lower duty had been levied on an article like Russian hemp, the stipulation in the treaty at once took effect, as part of our municipal law, and ·reduced the duty leviable on Russian hemp to twenty-five dollars per ton; and so, that under the laws of the United States, the amount beyond twenty-five dollars per ton, was illegally exacted, and can be recovered back in this action.

Several questions, involved in this position, require examination. One of them, when stated abstractly, is this,—if an act of congress should levy a duty upon imports, which an existing commercial treaty declares shall not be levied, so that the treaty is in conflict with the act, does the former or the latter give the rule of decision in a judicial tribunal of the United States, in a case to which one rule or the other must be applied? The second section of the fourth article of the constitution is: "This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made, under the authority of the United States, shall be the supreme law of the land." There is nothing in the language of this clause which enables us to say, that in the case supposed, the treaty, and not the act of congress, is to afford the rule. Ordinarily, treaties are not rules prescribed by sovereigns for the conduct of their subjects, but contracts, by which they agree to regulate their own conduct. This provision of our constitution has made treaties part of our municipal law. But it has not assigned to them any particular degree of authority in our municipal law, nor declared whether laws so enacted shall or shall not be paramount to laws otherwise enacted. No such declaration is made, even in respect to the constitution itself. It is named in conjunction with treaties and acts of congress, as one of the supreme laws, but no supremacy, is in terms assigned ·to one over the other. And when it became necessary to determine whether an act of congress repugnant to the constitution could be deemed by the judicial power an operative law, the solution of the question was found, by considering the nature and objects of each species of law, the authority from which each emanated, and the consequences of allowing or denying the paramount effect of the constitution. It is only by a similar course of inquiry that we can determine the question now under consideration.

In commencing this inquiry I think it material to observe, that it is solely a question of municipal, as distinguished from public law. The foreign sovereign between whom and the United States a treaty has been made, has a right to expect and require its stipulations to be kept with scrupulous good faith; but through what internal arrangements this shall be done, is, exclusively, for the consideration of the United States. Whether the treaty shall itself be the rule of action .of the people as well as the government, whether the power to enforce and apply it shall reside in one department, or another, neither the treaty itself, nor any implication drawn from it, gives him any right to inquire. If the people of the United States were to repeal so much of their constitution as makes treaties part of their municipal law, no foreign sovereign with whom a treaty exists could justly complain, for it is not a matter with which he has any concern. We may approach this question therefore free from any of that anxiety respecting the preservation of our national faith, which can scarcely be too easily awakened, or too sensibiy felt. For this question, in that aspect of it, is not, whether the act of congress is consistent with the treaty, but whether that is a judicial question to be here tried. If the act of congress, because, it is the later law, must prescribe the rule by which this case is to be determined, we do not inquire whether it proceeds upon a just interpretation of the treaty, or an accurate knowledge of the facts of likeness or unlikeness of the articles, or whether it was an accidental or purposed departure from the treaty; and if the latter, whether the reasons for that departure are such as commend themselves to the just judgment of mankind. It is sufficient that the law is so written, and, if I mistake not, we shall find by further examination, great reasons for not entering into these inquiries. By the eighth section of the first article of the constitution, power is conferred on congress to regulate commerce with foreign nations, and to lay duties, and to make all laws necessary and proper for carrying those powers into execution. That the act now in question is within the legislative power of congress, unless that power is controlled by the treaty, is not doubted. It must be admitted, also, that in general, power to legislate on a particular subject, includes power to modify and repeal existing laws on that subject, and either substitute new laws in their place, or leave the subject without regulation, in those particulars to which the repealed laws applied. There is therefore nothing in the mere fact that a treaty is a law, which would prevent congress from repealing it. Unless it is for some reason distinguishable from other laws, the rule which it gives may be displaced by the legislative power, at its pleasure.

The first and most obvious distinction between a treaty and an act of congress is, that the former is made by the president and ratified by two thirds of the senators present; the latter by majorities of both houses of congress and the president, or by the houses only, by constitutional majorities, if the president refuses his assent. Ordinarily, it is certainly

true, that the powers of enacting and repealing laws reside in the same persons. But there is no reason, in the nature of things, why it may not be otherwise. In the country from which we have derived many political principles, the king, by force of his prerogative makes laws for the colonies, which parliament repeals or modifies at its discretion. Campbell v. Hall, Cowp. 204. I think it is impossible to maintain that, under our constitution, the president and senate exclusively, possess the power to modify or repeal a law found in a treaty. If this were so, inasmuch as they can change or abrogate one treaty, only by making another inconsistent with the first, the government of the United States could not act at all, to that effect, without the consent of some foreign government; for no new treaty, affecting, in any manner, one already in existence, can be made without the concurrence of two parties, one of whom must be a foreign sovereign. That the constitution was designed to place our country in this helpless condition, is a supposition wholly inadmissible. It is not only inconsistent with the necessities of a nation, but negatived by the express words of the constitution. That gives to congress, in so many words, power to declare war, an act which, ipso jure, repeals all provisions of all existing treaties with the hostile nation, inconsistent with a state of war. It is true this particular power to repeal laws found in treaties, is expressly given, and is applicable only to a case of war; but, in the first place, it is sufficient to prove the position stated above, that there is nothing, in the nature of things, which requires that the same persons who make the law by a treaty, should alone have power to repeal it. In the next place, it is also true, that the powers to regulate commerce and to levy duties are as expressly given, as the power to declare war; and the former are as absolute and unrestrained as the latter.

It may be said that a declaration of war, being necessarily inconsistent with existing treaties with the hostile nation, the power to declare it is necessarily a power to repeal such treaties; but that power to regulate commerce and impose duties might be and was expected to be exercised in conformity with existing treaties. To a certain extent this may be admitted. But it cannot be admitted that these powers can be, or were expected to be exerted, under all circumstances, which might possibly occur in the life of a nation, in subordination to an existing treaty; nor that the only modes of escape from the effect of an existing treaty, were the consent of the other party to it, or a declaration of war. To refuse to execute a treaty, for reasons which approve themselves to the conscientious judgment of the nation, is a matter of the utmost gravity and delicacy; but the power to do so, is prerogative, of which no nation can be deprived, without deeply affecting its independence. That the people of the United States have deprived their government of this power in any case, I do not believe. That it must reside somewhere, and be applicable to all cases, I am convinced. I feel no doubt that it belongs to congress. That, inasmuch as treaties must continue to operate as part of our municipal law, and be obeyed by the people, applied by the judiciary and executed by the president, while they continue unrepealed, and inasmuch as the power of repealing these municipal laws must reside somewhere, and no body other than congress possesses it, then legislative power is applicable to such laws whenever they relate to subjects, which the constitution has placed under that legislative power. In conformity with these views was the action of congress, in passing the act of July 7, 1798 (1 Stat. 578), declaring the treaties with France no longer obligatory on the United States.

It is pertinent, to advert briefly to some of the consequences of holding an opposite doctrine, which are directly presented by the case at bar. If the treaty were held to be paramount to the act of congress on this trial, it would be necessary to determine, first, what is the true interpretation of the words, "like article"; and this would be a question of law to be decided by the court; and a rule having been thus obtained, the question whether Russian hemp is like Bombay or Manilla hemp, would be a matter of fact to be submitted to the jury. The just interpretation of the treaty, by which a practical rule may be arrived at, applicable to this particular case, and capable of guiding a jury in its decision, is attended with no small difficulty. The respective counsel for the parties have widely different views concerning it. The one contends that "like" denotes substantial identity; or, at least, sameness in all respects. That the origin, the mode of production and preparation, the uses to which each is adapted and applied, and the pecuniary value of each in the market, are all to be considered; and that an article made from a different plant, by different methods of manufacture, having substantially different qualities, not capable of being usefully employed for the same purposes, and bearing a much lower price in the market, is not "like," within the meaning of the treaty. The other maintains that these diversities are unimportant. Undoubtedly it is the duty of the court to encounter these difficulties, and ascertain the true rule, and it is the duty of the jury to apply this rule, and find their verdict accordingly, if this be a judicial inquiry. But it is quite plain, it cannot be competent for the court to go any further than a determination that the case is within the treaty. If congress legislates in subordination to the treaty, viewed as municipal law, it is not material what its reasons were for legislating in contravention of the treaty. If the other party to it, had by similar legislation, in admitted or plain disregard of the treaty, afforded the amplest reasons for counter legislation, how could

this court take notice of or weigh those reasons?

Is it a judicial question, whether a treaty with a foreign sovereign has been violated by him; whether the consideration of a particular stipulation in a treaty, has been voluntarily withdrawn by one party, so that it is no longer obligatory on the other; whether the views and acts of a foreign sovereign, manifested through his representative have given just occasion to the political departments of our government to withhold the execution of a promise contained in a treaty, or to act in direct contravention of such promise? I apprehend not. These powers have not been confided by the people to the judiciary, which has no suitable means to exercise them; but to the executive and the legislative departments of our government. They belong to diplomacy and legislation, and not to the administration of existing laws. And it necessarily follows, that if they are denied to congress and the executive, in the exercise of their legislative power, they can be found nowhere, in our system of government. On the other hand, if it be admitted that congress has these powers, it is wholly immaterial to inquire whether they have, by the act in question, departed from the treaty or not; or if they have, whether such departure were accidental or designed, and if the latter, whether the reasons therefor were good or bad. If by the act in question they have not departed from the treaty, the plaintiff has no case. If they have, their act is the municipal law of the country, and any complaint, either by the citizen, or the foreigner, must be made to those, who alone are empowered by the constitution, to judge of its grounds, and act as may be suitable and just.

There is another view of this case, which has been presented by the plaintiff's counsel, and requires examination. It is urged that, as Russian hemp is not specifically named, the court may conclude, it was not the intention of congress to include it under the words "all unmanufactured hemp"; that though these words are broad enough to include it, the obligation, arising from the treaty, not to include it, is such as to raise an exception of this article; and that the true construction of the act is, "upon all unmanufactured hemp, not hereinafter excepted, either expressly, or by force of the treaty with Russia, the duty is to be $40 a ton, and upon those so excepted $25 a ton." To this construction of the act, I think there are insuperable objections. It must be admitted at the outset, that it would do violence to the language of the act, and would force into it an exception which it does not contain. Why should this be done? It is said because it is offered to be proved to the satisfaction of a jury, by the evidence in this case, that Russian hemp is like Bombay hemp, and so there should be no discriminating duty levied. But, in the first place, this argument makes the jury the judges whether the case is, in point of fact, within the treaty, and then makes the court declare that, if within the treaty, there should be no discriminating duty. As already stated, I do not consider these to be judicial questions. It must be observed also, that there are two ways of avoiding discrimination. One is to reduce the duty on the article which is provided for in the treaty; the other, to increase the duty on the "like" article. The treaty is as well satisfied by one mode as by the other. If I were to assume that this case is within the treaty, and that it was the intention of congress not to depart from it, how shall I say that they intended to have the duty on Russian hemp $25 a ton, rather than the duty on Bombay hemp $40 a ton? One is as consistent with their language as the other; or rather neither can be reconciled with what they have said.

The truth is, that this clause in the treaty is merely a contract, addressing itself to the legislative power. The distinction between such treaties, and those which operate as laws in courts of justice, is settled in our jurisprudence. It was clearly pointed out in Foster v. Neilson, 2 Pet. [27 U. S.] 314. By the treaty between the United States and Spain, of the 22d of February, 1819 (8 Stat. 252), it was stipulated by the former, "that all grants of land made, &c., by his Catholic majesty. &c., shall be ratified and confirmed to the persons in possession of the lands, &c." The question arose, whether this clause operated on the titles to the lands. Mr. Chief Justice Marshall, delivering the opinion of the court said: "Our constitution declares a treaty to be a law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political not to the judicial department, and the legislature must execute the contract before it can become a rule for the court." After commenting on the language of the article, he proceeds. "This seems to be the language of contracts; and if it is, the ratification and confirmation which are promised, must be the act of the legislature. Until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject." This is the established doctrine under this treaty, as well as under that by which Louisiana was acquired. 8 Stat. 200., See Garcia v. Lee, 12 Pet. [37 U. S.] 519. Its applicability to a stipulation, like that now in question, is clear. The contract is to legislate in conformity with a rule therein given. This necessarily addresses itself, exclusively, to the legislative power. It is a rule of their action, and not of the action of courts of justice. They alone must determine which con-

struction it shall receive, and what cases are or are not within it, in point of fact, unless by law they refer these matters to the judicial department of the government. To some extent, congress has done so, both under the Florida and Louisiana treaties. But they have not done so under this treaty with Russia. And, in the language already quoted, "until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject."

For these reasons, I am of opinion that, inasmuch as the duty paid in this case was duly assessed and levied pursuant to the act of congress, there is no further or other question to be tried, and the plaintiffs cannot recover. I desire to add, what perhaps is not necessary, that the various suppositions of violation or departure from treaties by foreign sovereigns, or by our country, which are put by way of argument in the course of this opinion, have no reference whatever to the treaty now in question, or to any actual case; that I have not formed, or intended to intimate, any opinion, upon the question whether the duty levied upon hemp, the product of Russia, is, or is not higher, than a just interpretation and application of the treaty with the sovereign of that country would allow; as, in my judgment, it belongs to the political department of the government of the United States to determine this question.

[On error, the above judgment was affirmed by the supreme court. 2 Black (67 U. S.) 481.]