Nott, Ch. J.,
delivered the opinion of the court:
The vessel in this case sailed from Norfolk on the 26th of January, 1798, bound for a belligerent port, London, laden with tar and turpentine. Tar and turpentine, like horses, “belong to that disputable class of merchandise which may or may not be contraband, according to the circumstances of a case."’ (Brig Lucy, ante, p. 97.)
By the treaty with France, 1778 (Public Treaties, p. 210, art. xxiv), horses were declared to be contraband, and tar and turpentine, it was declared, "shall not be reputed contraband.” Such was the law between France and the United States. By the treaty of 179-1 with Great Britain (Public Treaties, p. 278, art. xviii) this policy was in part reversed, and tar and turpentine were declared to be contraband and-“just subjects of confiscation whenever they are attempted to be carried to an enemy.”
*306 The James and William was captured in February and condemned in March, 1798, on the ground that her cargo was contraband; that is to say, she was captured before the abrogation of the treaty' with France, but after the ratification of the treaty with Great Britain. According to the terms of the two treaties, if an American vessel at that time, laden with tar and turpentine, was sailing for a French port, a British prize court was justified in condemning the cargo as contraband. If she was sailing for a British port, a French prize court was bound, according to the letter of the treaty, to pronounce the cargo noncontraband.
Grounding his argument upon this diversity the counsel for the United States contends that the treaty with Great Britain was, in this particular, a rescisión and abandonment of the treaty with France; or that under the most-favored-nation provision of the treaty (art. ii) France was entitled to the benefit of the treaty with Great Britain.
The counsel for the claimants contend that the treaty with France was still in force and that this provision of the treaty related to commerce and navigation, and not to any matter of neutral rights in time of war.
The court is of the opinion that the United States relinquished no obligation to France by their treaty with Great Britain. A nation may abrogate a treaty as it may make a treaty — on its own motion, upon its own responsibility. There is no international forum which can decree that it has no right to do so. What follows the abrogation of a treaty is a matter between the two nations. It may be followed by an interval in which they have no treaty relations, or it may be followed by war. But a nation can not at its pleasure abrogate one article of a treaty and leave all of the other obligations in effect, binding the other power. The decree of the French Government abrogating so much of the treaty of 1778 as related to contraband goods on neutral vessels justified its own cruisers in seizing vessels and its own prize courts in condemning them, but without notice to and acquiescence on the part of the United States the decree could not ex proprio vigore extend to the treaty rights of the United States. In July, 1798 (Act 7th July, 1798, 1 Stat. L., 578), the United States abrogated the treaty in toto, and thereby relieved *307 France from all obligations under it. This court in these spoliation cases has always recognized that release from treaty obligation, and has given to France the full benefits, whatever they may have been, of such exemption.
The most-favored-nation clause of the treaty of 1778 is in these words:
“ The Most Christian King and the United States engage mutually not to grant any particular favor to other nations in respect of commerce and navigation which shall not immediately become common to the other party, who shall enjoy the same favor, freely, if the concession was freely made, or on allowing the same compensation if the concession was conditional.”
It is well known that such provisions in a treaty relate to duties, rights, and benefits in the ports of either ally, and it has been so said of this provision in the treaty of 1778. (Wharton’s Int. Law, vol. ii, sec. 148.) The other provisions of this treaty (art. xxm) related strictly to the procedure bétween the two nations in time of war. What they agreed should be the rule between themselves concerning goods which might or might not be contraband concerned only themselves. No other nation was benefited or injured bjr their entering into that treaty obligation. Conversely, the rule which the United States might establish in conjunction with any other power did not concern France. The definition of what should be regarded as contraband or not contraband was not a favor, but a mutual and reciprocal obligation. It worked both ways. If the case had been reversed, arid the United States had been the belligerent and France the neutral, the exemption would have operated against the United States. If American cruisers in these reversed conditions had seized French merchantmen, because France had made a different treaty with another power, it can not be supposed that France would have submitted to such seizures and condemnations.
It is also contended bjr the defendant’s counsel that so much of the cargo as belonged to Cowper & Co., of Norfolk, Ya., was liable to condemnation, because it did not appear by the ship’s papers that it was neutral property. There was, indeed, an invoice on board averring it to be such, but the invoice was not signed. Without passing upon the question whether such an invoice should have been regarded as evi- *308 deuce by the prize court of the neutrality of the cargo — that is to say, that it was the property of Cowper & Co., citizens of the United States, doing business in Norfolk, Ya. — the court is of the opinion that the cargo was illegally condemned under other provisions of the treaty of 1778.
It appears that the vessel carried a passport or sea letter from the President of the United States, such as was provided for by the treaty, “to the end that all manner of dissensions and quarrels may be avoided and prevented on one side and the other.” (Art. xxv.) The last clause of the article is in these words:
“And if anyone shall think it fit or advisable to express in the said certificate the person to whom the goods on board belong, he may freely do so.”
A previous article (xxiii) declares that free ships make free goods, and that it shall be lawful for citizens, people, and inhabitants of the said United States to sail with their ships with all manner of liberty and security, ‘ ‘ no distinction being-made who are the proprietors of the merchandizes laden thereon, from any port to the places of those who now are or hereafter shall be at enmity with the Most Christian King.” It also provides:
“And it is hereby stipulated that free ships shall also give a freedom to goods, and that everything shall be deemed to be free and exempt which shall be found on board the ships belongingtothesubjectof either of the confederates, although the whole lading or any part thereof should appertain to the enemies of either, contraband goods being always excepted. It is also agreed in like manner that the same liberty be extended to persons who are on board a free ship, with this effect, that although they be enemies to both or either party, they are not to be taken out of that free ship, unless they are soldiers and in actual service of the enemies.”
These provisions taken together clearly exempted the shipper and the ship from canying evidence of neutrality or ownership of the cargo. The unquestionable intent of the treaty was to reduce the dangerous power of the right of search to a minimum, excepting only from its liberal provisions contraband goods.
The case will be reported to Congress, together with a copy of this opinion.