# Validity of Congressional-Executive Agreements that Substantially Modify the United States' Obligations Under An Existing Treaty

It lies within Congress's power to authorize the President to modify substantially the United States' domestic and international legal obligations under a prior treaty, including an arms control treaty, by making an executive agreement with our treaty partners, without Senate advice and consent.

November 25, 1996

MEMORANDUM OPINION FOR THE
SPECIAL ASSISTANT TO THE PRESIDENT AND
LEGAL ADVISER TO THE NATIONAL SECURITY COUNCIL

You have sought our views on the question whether Congress can authorize the President to enter into an international agreement that substantially modifies the obligations which the United States would otherwise have under a pre-existing treaty, or whether only the Senate can do so, pursuant to the treaty-making power, U.S. Const. art. II, § 2, cl. 2.[1] We conclude that it lies within the power of Congress to authorize the President substantially to modify the United States' obligations under a prior treaty, including an arms control treaty.

A "treaty" in the constitutional sense[2] has two aspects: it may state a judicially enforceable rule of domestic law; and it creates binding obligations between or among the parties in international law. (*See* Part I below.) It is well established that Congress has the power, by legislation, to modify the domestic legal effects, if any, of a treaty. (*See* Part II below.) Insofar as the treaty embodies international legal obligations, these may remain in force, even after an Act of Congress has superseded the treaty as a matter of domestic law; but the States that are parties to the treaty may consent to the modification of the obligations that the treaty imposes. (*See* Part III below.) If Congress authorizes the President to enter into

---

[1] The context in which you had originally raised this question was Congress's consideration of a proposed provision of the Department of Defense Authorization Act for Fiscal Year 1997, purporting to prohibit the United States from being bound by any international agreement that would substantively modify the Treaty on the Limitation of Anti-Ballistic Missile Systems, May 26, 1972, United States–U.S.S.R., T.I.A.S. 7503, 23 U.S.T. 3435, unless that agreement was made pursuant to the President's treaty-making power specified in Article II, Section 2, Clause 2 of the Constitution. We had previously addressed another aspect of that legislation. *See Constitutionality of Legislative Provision Regarding ABM Treaty*, 20 Op. O.L.C. 246 (1996).

Our use of the term *authorize* necessarily contemplates the grant of authority prior to taking legally effective action. We thus perceive no distinction between "pre"-authorization and authorization in the present context.

[2] It is important to distinguish the constitutional sense of the term "treaty," which is relevant here, from other uses of the term in international or domestic law. "The word 'treaty' has more than one meaning. Under principles of international law, the word ordinarily refers to an international agreement concluded between two sovereigns, regardless of the manner in which the agreement is brought into force. Under the United States Constitution, of course, the word 'treaty' has a far more restrictive meaning. Article II, § 2, cl. 2, of that instrument provides that the President 'shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur.' " *Weinberger v. Rossi*, 456 U.S. 25, 29–30 (1982) (citation and footnotes omitted).

389

an executive agreement with our treaty partners to modify those obligations, and those States consent to such modifications when the President proposes them, then the treaty obligations can be modified by executive agreement, without Senate advice and consent. (*See* Part IV below.)

## I.

At the outset, it is essential to recognize the dual nature of treaties, as instruments of both domestic and international law. As the Supreme Court has said,

> [a] treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties of it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country.

*Head Money Cases*, 112 U.S. 580, 598 (1884).[3]

---

[3] *See also Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.) ("A treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is infra-territorial; but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision."); *Taylor v. Morton*, 23 F. Cas. 784, 785 (C.C.D. Mass. 1855) (No. 13,799) (Curtis, Circuit Justice), *aff'd*, 67 U.S. (2 Black) 481 (1862) (treaties are "contracts, by which [sovereigns] agree to regulate their own conduct" and, under the Constitution, "part of our municipal law"), *Goldwater v. Carter*, 617 F.2d 697, 705 (D.C. Cir.), *vacated*, 444 U.S. 996 (1979) ("a treaty is *sui generis*. It is not just another law. It is an international compact, a solemn obligation of the United States and a 'supreme Law' that supersedes state policies and prior federal laws. For clarity of analysis, it is thus well to distinguish between treaty-making as an international act and the consequences which flow domestically from such act. In one realm the Constitution has conferred the primary role upon the President; in the other, Congress retains its primary role as lawmaker."); 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* §317a, at 577 (2d ed. 1929) ("Treaties entered into by the United States may be viewed in two lights: (1) as constituting parts of the supreme law of the land, and (2) as compacts between the United States and foreign Powers.").

A "treaty," therefore, has two aspects: insofar as it is self-executing, it prescribes a rule of domestic or municipal law [4] and, as a compact or contract between nations, it gives rise to binding obligations in international law.[5]

## II.

Under the Supremacy Clause of the Constitution, treaties, like Acts of Congress, are made "supreme Law," U.S. Const. art. VI, cl. 2; *Maiorano v. Baltimore & Ohio R.R. Co.*, 213 U.S. 268, 272–73 (1909). Accordingly, "treaty provisions, which are self-executing in the sense that they require no additional legislation to make them effective, are equivalent to and of like obligation with an act of Congress." [6] Further, insofar as a treaty incorporates a rule of domestic law, the Supreme Court has long held that it may be modified or repealed by a later Act of Congress.[7] *See Head Money Cases*, 112 U.S. at 599 ("so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or repeal"); *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 460 (1899) ("Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate."); *Alvarez y Sanchez v. United States*, 216 U.S. 167, 175–76 (1910) ("an act of Congress, passed after a Treaty takes effect, must be respected and enforced, despite any previous or existing Treaty provision on the same subject"); *United States v. Stuart*, 489 U.S.

---

[4] As Chief Justice Marshall pointed out in *Foster v. Neilson*, 27 U.S. at 314, not all treaty provisions are self-executing: they may require implementing legislation to be given their full effect. Many treaties are, however, self-executing. For example, in *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) (Marshall, C.J.), the Court considered a treaty between the United States and France, ratified during the pendency of the appeal of the condemnation of a seized French vessel, that required that vessels seized by either nation should be restored if not yet definitively condemned. The Court held that the treaty controlled the disposition of the prize: the treaty was effective of its own force, without need of any further legislative action, and thus provided the rule of decision on appeal, rather than a prior statute that would have authorized the vessel's condemnation. The Supreme Court has given "self-executing" effect to numerous treaties. *See Disposition by Treaty of Territory or Property Belonging to the United States*, 43 Op. Att'y Gen. 96, 99, 103–04 & n.6 (1977) (Bell, A.G.) (citing cases), *see also* Samuel B. Crandall, *Treaties: Their Making and Enforcement* § 73, at 162–63 & n.16 (2d ed. 1916) (discussing distinction between self-executing and non-self-executing treaties, and illustrating former category).

[5] *See* The Vienna Convention on the Law of Treaties, art. 26 ("Every treaty in force is binding upon the parties to it and must be performed by them in good faith."), *reprinted in Basic Documents in International Law* 388, 400 (Ian Brownlie ed., 4th ed. 1995). Although not ratified by the United States, this convention "is frequently cited . . . as a statement of customary international law." *Review of Domestic and International Legal Implications of Implementing the Agreement with Iran*, 4A Op. O.L.C. 314, 321 (1981).

[6] *Canadian Boundary Waters*, 30 Op. Att'y Gen. 351, 353 (1915) (citing *Foster v. Neilson*, 27 U.S. at 314; *The Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 621 (1870); *Chew Heong v. United States*, 112 U.S. 536, 539 (1884); *Head Money Cases*, 112 U.S. at 599; and *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)). *See also Cook v. United States*, 288 U.S. 102, 118–19 (1933); *Exemption of Resident Aliens from Military Service Pursuant to Treaties — Bar to Eligibility for Citizenship*, 42 Op. Att'y Gen. 373, 379 (1968).

[7] There was some earlier authority to the contrary. *See Thompson's Case*, 9 Op. Att'y Gen. 1, 6 (1857) (Black, A.G.) ("Congress has no authority to abrogate a treaty made by the Executive, any more than the Executive has to abrogate a law passed by Congress.").

353, 375 (1989) (Scalia, J., concurring in judgment) (Congress "may abrogate or amend [a treaty] as a matter of internal law by simply enacting inconsistent legislation."); *Congressional Authority to Modify an Executive Agreement Settling Claims Against Iran*, 4A Op. O.L.C. 289 (1980).[8]

The rationale for this rule was set forth in 1855 by Justice Curtis, sitting as Circuit Justice. Justice Curtis wrote:

> The first and most obvious distinction between a treaty and an act of congress is, that the former is made by the president and ratified by two thirds of the senators present; the latter by majorities of both houses of congress and the president, or by the houses only, by constitutional majorities, if the president refuses his assent. Ordinarily, it is certainly true, that the powers of enacting and repealing laws reside in the same persons. But there is no reason, in the nature of things, why it may not be otherwise. . . . I think it is impossible to maintain that, under our constitution, the president and senate exclusively, possess the power to modify or repeal a law found in a treaty. If this were so, inasmuch as they can change or abrogate one treaty, only by making another inconsistent with the first, the government of the United States could not act at all, to that effect, without the consent of some foreign government; for no new treaty, affecting, in any manner, one already in existence, can be made without the concurrence of two parties, one of whom must be a foreign sovereign. That the constitution was designed to place our country in this helpless condition, is a supposition wholly inadmissible.

*Taylor v. Morton*, 23 F. Cas. at 785–86.

Accordingly, it lies within the power of Congress to modify the substantive obligations that a treaty imposes upon the United States, or to authorize the President to modify those obligations, insofar as those treaty obligations are binding as a matter of domestic or municipal law. The advice and consent of the Senate are not necessary to achieve that outcome.

---

[8] Similarly, a treaty can supersede a prior Act of Congress to the extent that the two are incompatible. *See Charlton v. Kelly*, 229 U.S. 447, 463 (1913); *United States v. Lee Yen Tai*, 185 U.S. 213, 220 (1902); *Canadian Boundary Waters*, 30 Op. Att'y Gen. at 352–53; Congressional Research Service, *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 99–16, at 505 (1982); Samuel B. Crandall, *Treaties: Their Making and Enforcement* §72, at 161–62.

## III.

### A.

The unilateral modification or repeal of a provision of a treaty by Act of Congress, although effective as a matter of domestic law, will not generally relieve the United States of the international legal obligations that it may have under that provision. *See Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934) (while an Act of Congress that conflicted with a treaty provision "would control in our courts as the later expression of our municipal law . . . the international obligation [would] remain[ ] unaffected"). Secretary of State Charles Evans Hughes (later the author, as Chief Justice, of the *Pigeon River* opinion) explained the position well:

> a judicial determination that an act of Congress is to prevail over a treaty does not relieve the Government of the United States of the obligations established by a treaty. The distinction is often ignored between a rule of domestic law which is established by our legislative and judicial decisions and may be inconsistent with an existing Treaty, and the international obligation which a Treaty establishes. When this obligation is not performed a claim will inevitably be made to which the existence of merely domestic legislation does not constitute a defense and, if the claim seems to be well founded and other methods of settlement have not been availed of, the usual recourse is arbitration in which international rules of action and obligations would be the subject of consideration.[9]

"[W]e are bound to observe [a treaty] with the most scrupulous good faith . . . [O]ur Government could not violate [it], without disgrace." *The Amiable Isabella*, 19 U.S. 1, 68 (1821). "The foreign sovereign between whom and the United States a treaty has been made, has a right to expect and require its stipulations to be kept with scrupulous good faith . . . ." *Taylor v. Morton*, 23 F. Cas. at 785.[10] "A party may not invoke the provisions of its internal law as justification

---

[9] Letter for the Secretary of the Treasury, from the Secretary of State, Feb. 19, 1923, *quoted in* 5 Green Haywood Hackworth, *Digest of International Law* § 489, at 194–95 (1943).

[10] Chief Justice (and former President) Taft, sitting as sole arbitrator in an international dispute, stated that a treaty may repeal a statute, and a statute may repeal a treaty. The Supreme Court cannot under the Constitution recognize and enforce rights accruing to aliens under a treaty which Congress has repealed by statute. *In an international tribunal, however, the unilateral repeal of a treaty by a statute would not affect the rights arising under it and its judgment would necessarily give effect to the treaty and hold the statute repealing it of no effect.*

Continued

for its failure to perform a treaty." Vienna Convention on the Law of Treaties, art. 27, *reprinted in Basic Documents in International Law* at 400.

## B.

As with contracts of other kinds, however, the parties to a treaty may agree to modify the obligations to which the treaty gives rise. It is "a general principle of [international] law recognized by civilized nations" that "[a]ny legal position, or system of legal relationships, can be brought to an end by the consent of all persons having legal rights and interests which might be affected by their termination." *International Status of South-West Africa*, 1950 I.C.J. 128, 167 (July 11) (Separate Opinion of Judge Read). As a general rule of international law, therefore, "[a] treaty may be amended by agreement between the parties." Vienna Convention on the Law of Treaties, art. 39, *reprinted in Basic Documents in International Law* at 404.[11] The principle was well stated in a study prepared for the Senate Foreign Relations Committee:

> The amendment of a binding international agreement may be accomplished in a variety of ways including, among others, . . . by the consent of the parties . . . . Amendment or modification of an international agreement by consent of the parties is recognition of the fact that consent is the basis of international agreements. Accordingly, the parties are at liberty to change an international agreement regardless of its terms. For similar reasons, a later agreement on the same subject involving the same parties that expressly or impliedly modifies an earlier agreement will be regarded as effecting the resulting change.

*Treaties and Other International Agreements: The Role of the United States Senate*, S. Rep. No. 53, 103d Cong., 1st Sess. 140 (Comm. Print 1993) ("S. Rep. 53").[12]

---

18 Am. J. Int'l L. 147, 159–60 (1924) (emphasis added). *See also The Ship James and William*, 37 Ct. Cl. 303, 306 (1902) (decree of French Government abrogating provisions of treaty of 1778 relating to contraband goods on neutral vessels justified French courts in condemning such vessels if seized by French cruisers, but did not abrogate any treaty right of the United States); *Ropes v. Clinch*, 20 F. Cas. 1171, 1174 (C.C.S.D.N.Y. 1871) (No. 12,041) (Congress may "legislate as if no such treaty existed, in modification or alteration of what, by force of the treaty, has been the law heretofore, thus modifying the law of the land, without denying the existence of the treaty, or the obligations thereof between the two governments, as a contract, and answer therefor to such foreign government, or meet its reclamation or retaliation as may be necessary."); 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* § 324, at 585 ("The termination of a treaty as an international compact carries with it the annulment of the agreement as a law of the land, but its annulment as a law by Congress does not carry with it its annulment as an international compact.").

[11] This Convention details in arts. 40 and 41 more specific rules for the amendment (as among all the parties) and modification (as among certain of the parties) of a multilateral treaty.

[12] *See also* David A. Koplow, *When Is An Amendment Not An Amendment? Modification Of Arms Control Agreements Without The Senate*, 59 U. Chi. L. Rev. 981, 1023 (1992) ("International law imposes few limitations upon parties' abilities to change their treaty obligations. In general, states are free to alter their commitments to any

The United States has often modified its treaty rights and obligations through agreements with its treaty partners: "following a precedent established in 1784 when the Treaty of Commerce and Amity with France was modified by an exchange of notes between the French Foreign Minister and Benjamin Franklin, executive agreements have not infrequently been utilized as a method of altering treaties." [13] Thus, assuming that the consent of our treaty partners was obtained, the United States could, as a matter of *international* law, substantially modify its pre-existing treaty obligations by agreement with its treaty partners.

The only remaining question, therefore, is whether, as a matter of *constitutional* law, the President has the power to modify, by means of an executive agreement authorized by Act of Congress, the international legal obligations that the United States has under a treaty, or whether the only constitutional method by which the President may achieve that end is through the advice and consent of the Senate. We discuss that question in the following section.

## IV.

## A.

"When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The Supreme Court has repeatedly emphasized the sweeping authority of the President in the field of foreign affairs, particularly when his own considerable inherent powers in that area are augmented by those of Congress. *See, e.g., Dames & Moore v. Regan,* 453 U.S. 654, 674 (1981); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 109–10 (1948); *Hirabayashi v. United States,* 320 U.S. 81, 92–93 (1943); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936). We believe that the inherent powers of the President over foreign affairs, coupled with whatever powers Congress can and does delegate to him in this area, are constitutionally sufficient to enable the President to make an executive agreement that substantially modifies the international legal obligations of the United States under a prior treaty. [14]

---

extent, at any time, and in any manner, provided that they are reasonably clear about what they are doing and that they reciprocally agree or at least acquiesce in the outcome.").

[13] Myres S. McDougal & Asher Lans, *Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy,* 54 Yale L.J. 181, 334 (1945) (footnote omitted).

[14] We do not consider here how far the President has the authority, acting without *either* Senate advice and consent *or* an Act of Congress, substantially to modify the United States' obligations under treaty or international law. We note, however, that the executive branch has taken the position that the President possesses the authority to terminate a treaty in accordance with its terms by his unilateral action, and a plurality of the Supreme Court concluded that the issue was a non-justiciable political question. *See Goldwater v. Carter,* 444 U.S. at 1003 (plurality op.). *See generally* Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of

Continued

395

The Constitution makes the President the Nation's "guiding organ in the conduct of our foreign affairs . . . . He . . . was entrusted with . . . vast powers in relation to the outside world . . . ." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948).[15] Pursuant to his inherent powers, the President has made executive agreements with other countries, not submitted to the Senate for its advice and consent or to Congress for its approval, including agreements that regulated the use of military forces.[16] Congress too — as distinct from the Senate under its treaty-making power — has some power to vary the international legal obligations of the United States.[17] So, for example, in *Weinberger v. Rossi*, 456 U.S. at 32, the

Legal Counsel, *Re: Presidential Authority to Modify the Conditions under which the United States Will Recognize the Compulsory Jurisdiction of the International Court of Justice Without Prior Congressional Approval* at 1 (Apr. 9, 1984) ("although the question has never been definitively resolved by the courts, a substantial body of judicial, historical, and scholarly support exists for the proposition that, under certain circumstances, the President is constitutionally empowered unilaterally to terminate an existing treaty in accordance with its terms"). *But see International Load Line Convention*, 40 Op. Att'y Gen. 119, 123 (1941) (opining that President had power to suspend a treaty, but suggesting that "action by the Senate or by the Congress" would be "required" to "denounce" or "otherwise abrogate[ ]" it).

Assuming that the President *does* have the power unilaterally to terminate a treaty, it appears to follow that he also has the authority to relieve the United States of the affirmative obligations imposed on it by particular treaty provisions. It would not follow, however, that he had the authority unilaterally to *augment* the United States' treaty obligations. Moreover, it has been held that the President has no constitutional power to abrogate rights under *Indian* treaties. *See Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 861 F. Supp. 784, 823–24 (D. Minn. 1994), *appeal dismissed*, 48 F.3d 373 (8th Cir. 1995).

[15] The President's authority in the field of foreign affairs flows, in large part, from the President's position as Chief Executive, U.S. Const. art. II, §1, cl. 1, and as Commander in Chief, *id.* art. II, §2, cl. 1. It also derives from his more specific powers to "make Treaties" with the advice and consent of two-thirds of the Senators present, *id.* art. II, §2, cl. 2; to "appoint Ambassadors . . . and Consuls," *id.*; and to "receive Ambassadors and other public Ministers," *id.* art. II, §3. The Supreme Court has repeatedly recognized the President's authority with respect to the conduct of foreign affairs. *See, e.g., Department of Navy v. Egan*, 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive' ") (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705–06 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch . . . ."); *United States v. Louisiana*, 363 U.S. 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations").

[16] The President's "inherent powers" as Commander in Chief are "clearly extensive." *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and in the judgment). The executive agreements that past Presidents have concluded under the Commander in Chief authority have often been "important compacts," such as the armistice, or peace protocol, with Spain, of August 12, 1898, establishing the basis of the conditions for ending the Spanish-American War. 2 Charles Cheney Hyde, *International Law Chiefly As Interpreted and Applied by the United States* §508, at 1411 (2d rev. ed. 1945). *See also* 5 John Bassett Moore, *A Digest of International Law* 213 (1906).

[17] That proposition might be questioned. *See, e.g.,* 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* §324, at 585 ("it seems almost too clear for argument that Congress, not having been made by the Constitution a participant in the treaty-making power, has no constitutional authority to exercise that power either affirmatively or negatively, that is, by creating or destroying international agreements").

We believe that Congress *does* possess delegable authority in this area. First, among the powers vested in Congress by the Constitution is the power of declaring war. U.S. Const. art. I, §8, cl. 11. A declaration of war is a legislative act that can have the effect of abrogating a treaty in whole or in part. *See Karnuth v. United States*, 279 U.S. 231, 239–41 (1929) (Declaration of War of 1812 abrogated provision of Treaty of 1794 granting British subjects right freely to enter United States); *see also Valk v. United States*, 29 Ct. Cl. 62, 67 (1894), ("war supersedes treaties of peace and friendship"), *aff'd*, 168 U.S. 703 (1897); *cf. Argento v. Horn*, 241 F.2d 258, 260–62 (6th Cir.) (Potter Stewart, J.) (extradition treaty with Italy was suspended but not abrogated by war), *cert. denied*, 355 U.S. 818 (1957). When Congress acts under its war power, "a wide latitude of discretion must be accorded" to it, for on that power "the very life of the nation depends." *Hamilton v. Kentucky Distillers & Warehouse Co.*, 251 U.S. 146, 163 (1919) (Brandeis, J.); *see also Dryfoos v. Edwards*, 284 F. 596, 599 (S.D.N.Y. 1919) (L. Hand, J.) (Congress' war power may "be inferred [not only from specific clauses of article I, but also] from the fact that the United States is the only sovereign recognized among the world of nations, within the territory of the

Supreme Court implied that Congress, if it expressed its intent with sufficient clarity, could effect the abrogation of the United States' international obligations, as set forth in international agreements for the hiring of local nationals at the United States' overseas military bases.[18] It can reasonably be maintained that, if Congress may effect the *abrogation* of international obligations, it has some power to authorize the President to *modify* them.

## B.

The practice of the two branches discloses many examples of binding agreements that Presidents have made with foreign States, relying on the inherent authority of the Executive, as affirmed and amplified by Congress. As the Senate Foreign Relations Committee study cited above points out,

> Congressional authorization for the conclusion of international agreements dates from the earliest days of the Nation's constitutional history. Thus, in 1790 Congress empowered the President to pay off the Revolutionary War debt by borrowing money from foreign countries "upon terms advantageous to the United States" and to conclude "such other contracts respecting the said debt as shall be found for the interest of the said States." Two years later

United States, at once responsible and vested with any of the powers which are customarily exercised by such a sovereign so charged"), *aff'd sub nom., Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146 (1919). Accordingly, it is at least arguable that Congress' war power enables it to enact legislation, other than a formal declaration of war, that authorizes the President to vary the United States' obligations under disarmament or other political-military treaties. *Accord* Armen R. Vartian, *Approval of SALT Agreements by Joint Resolution of Congress*, 21 Harv. J. Int'l L. 421, 441 (1980) ("it is clear that the power of Congress to legislate with regard to arms control matters is nearly unlimited, and, when combined with the President's authority as Commander in Chief, is plenary") (footnotes omitted).

Furthermore, Congress has been held to have the power to make *peace* by legislation, as an alternative to a treaty. *See Ludecke v. Watkins*, 335 U.S. at 168. Indeed, because of the Senate's refusal to ratify the Treaty of Versailles, Congress by joint resolution authorized the President to terminate the war with Germany, *see* 42 Stat. 105 (1921). The validity of Congress' action was recognized by both the Supreme Court, *see Commercial Trust Co. v. Miller*, 262 U.S. 51, 57 (1923), and by the Executive, *see* Proclamation of Peace by the President, Aug. 25, 1921, 42 Stat. 1939, 1944. Again, it may be inferred that if Congress may make peace, it may authorize Executive agreements, such as arms control measures, that conduce to peace.

Finally, the Constitution vests in Congress the power to "provide for the common Defence . . . of the United States." U.S. Const. art. I, § 8, cl. 1. The Supreme Court has indicated that this clause enables Congress to authorize the President to make agreements with foreign States that were directly related to the Nation's defense. In *People of the State of New York ex rel. Rogers v. Graves*, 299 U.S. 401 (1937), the Court reviewed a large body of legislation dealing with the Panama Canal. These statutes included the Act of June 28, 1902, ch. 1302, 32 Stat. 481, which authorized the President to enter into an agreement to acquire control of a strip of land—the Panama Canal Zone—from the Republic of Colombia. To enact this mass of legislation, the Court said, lay "within the constitutional power of Congress to provide for the national defense." 299 U.S. at 406. Arguably, therefore, the "common Defence" clause also confers on Congress delegable power to authorize the President to enter into executive agreements that modify our obligations under prior arms control treaties.

[18] *See also Van Der Weyde v. Ocean Transp. Co.*, 297 U.S. 114, 118 (1936) (Act of Congress requesting and directing President to give notice to treaty partners of termination of treaties inconsistent with domestic legislation made it "incumbent upon the President . . . to reach a conclusion as to the inconsistency" between treaty provisions and domestic statute, and "[h]aving determined that [treaty provisions'] termination was necessary, the Preside through the Secretary of State took appropriate steps to effect it.").

> the Postmaster General was authorized to make arrangements with the postmasters in any foreign country for the reciprocal receipt and delivery of letters and packets, through the post-offices. . . . Over the years, Congress has authorized or sanctioned additional agreements concerning a wide variety of subjects including *inter alia*, the protection of intellectual property rights, acquisition of territory, national participation in various international organizations, foreign trade, foreign military assistance, foreign economic assistance, atomic energy cooperation, and international fishery rights.

S. Rep. 53, at 52–53 (footnotes omitted). *See also Seizure of Foreign Ships on the High Seas Pursuant to Special Arrangements*, 4B Op. O.L.C. 406, 407 (1980) ("The President has Congress' express authority to enter into special arrangements [with foreign countries], including those that will aid the United States' effort to curtail drug traffic."); *Validity of Commercial Aviation Agreement*, 40 Op. Att'y Gen. 451, 452 (1946) (Clark, A.G.) ("It is recognized that there are many classes of agreements with foreign countries which are not required to be formulated as treaties . . . [including] that class of executive agreements which are entered into in accordance with, and within the scope of, authority vested in the executive branch by legislation enacted by the Congress. Notable examples of agreements which fall within this class are postal conventions and reciprocal trade agreements."); *Postal Conventions with Foreign Countries*, 19 Op. Att'y Gen. 513, 520 (1890) (Taft, S.G.) (beginning with legislation of 1792, the Postmaster General, by virtue of Congressional authorization, "has exercised the treaty-making power of the Government in so far as it was necessary to the improvement of the foreign mail service," without obtaining the advice and consent of the Senate to such postal conventions). *Cf. Antoine v. Washington*, 420 U.S. 194, 204 (1975) (Court has repeatedly treated Executive agreements with Indian tribes ratified by later Acts of Congress as "law, and like treaties, the supreme law of the land").[19]

The constitutionality of such "Congressional-Executive agreements" is firmly established. *Accord* S. Rep. 53, at 58.[20] The Supreme Court long ago rejected arguments that such agreements constitute an invalid delegation of power to the President or the House of Representatives, or an improper invasion of the Senate's treaty-making power. *See J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 410–11 (1928); *Field v. Clark*, 143 U.S. 649, 694 (1892); *see also Whether Uruguay Round Agreements Required Ratification as a Treaty*, 18 Op. O.L.C.

---

[19] Among earlier international agreements which were accomplished by Congressional-Executive agreements rather than by Article II treaties were the annexation of Texas, *see Texas v. White,* 74 U.S. (7 Wall.) 700 (1868) and of Hawaii, *see Hawaii v. Mankichi,* 190 U.S. 197 (1903). For discussion of the background of these two annexations, *see Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea,* 12 Op. O.L.C. 238, 251–52 (1988); Louis Fisher, *Constitutional Conflicts between Congress and the President* 227–28 (3d rev. ed. 1991).

[20] *But see* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation,* 108 Harv. L. Rev. 1221, 1249–78 (1995) (defending exclusivity of Treaty Clause).

232, 234 (1994).[21] An international agreement negotiated by the President and concluded with prior, or subsequent, authorization from Congress has "the force and effect of an act of Congress." 2 Op. O.L.C. 227, 229 (1978).

## C.

Of particular relevance here, the practice of the political branches underscores that the President has the authority to make Congressional-Executive agreements with our treaty partners that substantially modify the United States' rights or obligations under those treaties.

Congress has enacted legislation in the political-military field that permits the modification of the United States' international obligations through a Congressional-Executive agreement as an alternative to the treaty-making process. The Arms Control and Disarmament Act of 1961, Pub. L. No. 87–297, § 33, 75 Stat. 634, as recently amended by Pub. L. No. 103–236, § 709, 108 Stat. 382, 494 (1994) (codified in relevant part at 22 U.S.C. § 2573(b)), provides that no action obligating the United States to reduce or limit its Armed Forces or armaments "in a militarily significant manner" can be taken "except pursuant to the treaty-making power of the President set forth in Article II, Section 2, Clause 2 of the Constitution *or unless authorized by the enactment of further affirmative legislation by the Congress of the United States*" (emphasis added).[22]

Further, in a 1990 study, the Congressional Research Service identified three Congressional-Executive agreements since 1970 of a political-military nature; each of them could arguably have been adopted as a treaty instead. These were the Interim Agreement on the Limitation of Stategic Offensive Arms ("Salt I"), signed May 26, 1972, entered into force October 3, 1972, T.I.A.S. No. 7504, 23 U.S.T. 3462, which President Nixon submitted to Congress for its approval by joint resolution, and which Congress authorized in Pub. L. No. 92–448, 86 Stat.

---

[21] "Notwithstanding that the text of the Constitution confers no explicit authority for the making of congressional-executive agreements, such agreements have been authorized frequently by Congress over the years on a wide variety of subjects. Similarly, the courts have been little troubled by theoretical considerations and have sustained such agreements largely on the basis of the actual practice of the political branches of the government and the cumulative weight of prior judicial decisions. Presumably, if a doctrinal basis were at this date necessary to uphold agreements of this type, the combined foreign affairs powers of the Congress and the President would prove sufficient." S. Rep. 53, at 58–59.

[22] The legislative history of section 33 of the Arms Control and Disarmament Act indicates that neither the Senate nor the House of Representatives regarded the provision as infringing on the Senate's treaty-making power. *See* Armen R. Vartian, *Approval of SALT Agreements by Joint Resolution of Congress*, 21 Harv. J. Int'l L. at 446–47 & n.95.

The Senate had previously recognized that international political-military obligations could be undertaken by Act of Congress rather than by treaty when, in 1943, it adopted the Connally Resolution. That resolution provided that the United States, "acting through its constitutional processes," could join in an international authority with the power to prevent aggression. The resolution's reference to "constitutional processes" was understood to mean "that international commitments (in this case joining the United Nations) could be made either by treaty or by a majority of each House voting on a bill or joint resolution." Louis Fisher, *Presidential War Power* 74 (1995); *see also* 89 Cong. Rec. 8662 (1943) (explanation of terms used in resolution).

746, signed September 30, 1972 [23]; a pair of identical agreements made by President Ford in 1975 with Egypt and Israel, under which the United States undertook to participate in an early-warning system in the Sinai, which Congress approved in Pub. L. No. 94–110, 89 Stat. 572, signed October 13, 1975, and which entered into force on the same date, T.I.A.S. No. 8155, 26 U.S.T. 2271 (Israel), T.I.A.S. No. 8156, 26 U.S.T. 2278 (Egypt); and a protocol signed by the United States, Egypt and Israel on August 3, 1981, T.I.A.S. No. 10556, 34 U.S.T. 3341, entered into force August 3, 1981, and T.I.A.S. No. 10557, 34 U.S.T. 3349, entered into force March 26, 1982, outlining United States participation in a Multinational Force and Observers unit, to function as a peacekeeping force in Sinai, for which President Reagan requested and obtained Congressional authorization in Pub. L. No. 97–132, 95 Stat. 1693, signed December 29, 1981. *See* Ellen C. Collier & James V. Saturno, Congressional Research Service, *Executive Agreements Submitted to Congress: Legislative Procedures Used Since 1970* (Nov. 26, 1990).[24]

Congress has also ratified, by legislation, Executive acts that substantially modified pre-existing treaty (or other international) obligations. Under article 3 of the Treaty of Peace with Japan, Sept. 8, 1951, T.I.A.S. No. 2490, 3 U.S.T. 3169, 3172–73, Japan was required to concur in any proposal that the United States made to the United Nations for placing certain islands under trusteeship. By a 1953 executive agreement, T.I.A.S. No. 2895, 4 U.S.T. 2912, President Eisenhower agreed to relinquish to Japan the United States' rights under the Treaty of Peace with respect to the Amami Islands. Although it appears that no prior legislative authorization for this modification of the treaty existed, Congress in 1960 impliedly ratified the President's action in Pub. L. No. 86–629, 74 Stat. 461, an Act, "To provide for the promotion of economic and social development in the Ryukyu Islands." [25]

Finally, in its Resolution of Advice and Consent of 27 May 1988 to the U.S.–U.S.S.R. Treaty on the Elimination of Their Intermediate-Range and Shorter-Range Missiles (INF Treaty), the Senate adopted the "Biden condition," which

---

[23] "[T]he Interim Agreement of 1972 was by no means the first non-treaty agreement pertaining to arms limitation or national security. In addition to numerous armistice agreements, the Rush-Bagot Agreement of 1817, 8 Stat. 231, T.S. No. 110 1/2 (1846), the 'Hot Line' Agreement of 1963, 1 U.S.T. 825, T.I.A.S. No. 5362, and unwritten agreements with the Soviet Union concerning moratoriums on nuclear testing (1958–1961) and placing nuclear weapons in orbit (1963–1967), among others, were effected without Senate approval." Armen R. Vartian, *Approval of SALT Agreements by Joint Resolution of Congress*, 21 Harv. J. Int'l L. at 442 n.77.

[24] In light of such judicial and historical precedents, the General Counsel to the Clerk of the House of Representatives concluded that "the United States may appropriately choose to negotiate an arms accord in the form of a Congressional-Executive agreement, and approve it by legislation, as an alternative to treaty ratification." Memorandum for the Honorable Dante B. Fascell, Chairman, House Committee on Foreign Affairs, from Steven R. Ross, General Counsel to the Clerk, and Charles Tiefer, Deputy General Counsel to the Clerk, *Re: Congressional Approval of an Arms Control Agreement by Legislation Rather than Treaty Ratification* (May 23, 1985), *reprinted in* 134 Cong. Rec. 7323 (1988). *See also* Memorandum for Ambassador Kampelman, Counselor, from Michael J. Matheson, Deputy Legal Adviser, *Re: Form of submission of arms control agreements* (Apr. 14, 1988), *reprinted in* 134 Cong. Rec. at 7324 ("Neither the [Arms Control and Disarmament Act] nor the Constitution dictates which of these two options the President should exercise with respect to a particular [arms control] agreement," but noting that "[w]ith one exception, the significant arms control agreements of the past few decades have all been submitted for the advice and consent of the Senate as treaties.").

[25] *See* 14 Marjorie M. Whiteman, *Digest of International Law* § 23, at 230 (1970).

provides that "the United States shall interpret the Treaty in accordance with the common understanding of the Treaty shared by the President and the Senate at the time the Senate gave its advice and consent to ratification," and that "the United States shall not agree to or adopt an interpretation different from that common understanding except pursuant to Senate advice and consent to a subsequent treaty or protocol, *or the enactment of a statute.*" 134 Cong. Rec. 12,849 (1988) (emphasis added). The Senate affirmed "the applicability to all treaties of the constitutionally-based principles" in this condition. Resolution of Advice and Consent of 25 November 1991 to the Treaty on Conventional Armed Forces in Europe (CFE Treaty), 137 Cong. Rec. 34,347, 34,348 (1991), adopted *id.* at 34,546. Because the Senate took the view that such "common understandings" of a treaty had the same binding effect as express provisions of the treaty for purposes of U.S. law, the Biden condition logically supports the proposition that the President may be authorized to accept changes in treaty obligations either by further Senate advice and consent *or by statutory enactment.*

In light of these judicial and historical precedents, we conclude that Congress may authorize the President, through an executive agreement, substantially to modify the United States' international obligations under an arms control (or other political-military) treaty.

## Conclusion

It lies within the power of Congress to authorize the President substantially to modify the United States' domestic and international legal obligations under a prior treaty, including an arms control treaty.

CHRISTOPHER SCHROEDER
*Acting Assistant Attorney General*
*Office of Legal Counsel*